108 T.C. No. 17


UNITED STATES TAX COURT


ROBERT A. STANFORD AND SUSAN STANFORD, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 103-94.                          Filed April 29, 1997.


        <u>Held</u>:  For 1990, (1) subpart F income of
    a controlled foreign corporation may not be
    reduced by deficits in earnings and profits
    of a controlled foreign sister corporation;
    and (2) on the particular facts of this case,
    subpart F income of a controlled foreign
    corporation may not be reduced by deficits in
    earnings and profits of a controlled foreign
    parent corporation.


    <u>Salvador E. Rodriquez</u> and <u>Maxime Louis Bouthillette</u>, for

petitioners.

    <u>Lillian D. Brigman</u> and <u>Susan Sample</u>, for respondent.

SWIFT, Judge: Respondent determined a deficiency in, an addition to tax on, and an accuracy-related penalty on petitioners' 1990 joint Federal income tax as follows:

| Deficiency | Addition to Tax Sec. 6651(a)(1) | Accuracy-Related Penalty Sec. 6662(a) |
|---|---|---|
| $423,531 | $101,585 | $84,706 |

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for 1990, and all Rule references are to the Tax Court Rules of Practice and Procedure. All references to petitioner are to Robert A. Stanford.

The issues for decision are whether subpart F income of a controlled foreign corporation may be reduced by deficits in earnings and profits of a controlled foreign sister corporation and whether subpart F income of a controlled foreign corporation may be reduced by deficits in earnings and profits of a controlled foreign parent corporation.

FINDINGS OF FACT

Many of the facts have been stipulated and are so found. During the year in issue, petitioners were U.S. citizens and resided in Houston, Texas.

In the mid-1980's, favorable laws in the crown colony of Montserrat, British West Indies, made it relatively easy and profitable for individuals to establish and to operate private

banks and related companies in Montserrat.

Under the laws of Montserrat, petitioner in 1985, 1986, and 1987, respectively, formed Guardian International Bank Ltd. (Guardian Bank), Guardian International Investment Services Ltd. (Guardian Services), and Stanford Financial Group Inc. (Stanford Financial), as controlled foreign corporations for the purposes of engaging in offshore banking and other activities.

By 1990, petitioner owned 95 percent of the shares of stock in Stanford Financial. Stanford Financial, in turn, owned nearly 100 percent of the shares of stock in Guardian Bank and Guardian Services. Thus, by 1990, Guardian Bank and Guardian Services were brother/sister subsidiary corporations owned by Stanford Financial as the parent corporation.

More specifically, on December 12, 1985, petitioner formed Guardian Bank as a Montserrat corporation for the purpose of engaging in certain offshore banking activities. Upon its formation, petitioner and petitioner's father each owned 50 percent of the shares of stock in Guardian Bank.

In its articles of association or charter, Guardian Bank's stated business purpose to engage in the business of banking was defined broadly and included administrative, management, and marketing functions relating to the business of banking, as follows:

> (1) To carry on the business of Banking in all its branches and to transact and do all matters and things incidental

thereto, or which may at any time hereafter, at any place where the company shall carry on business, be usual in connection with the business of banking or dealing in money or security for money.

* * * * * * *

(8)  To act as agents for the sale and purchase of any stocks, shares or securities, or for any other monetary or mercantile transaction.

* * * * * * *

(12)  To contract for public and private loans, and to negotiate and issue the same.

* * * * * * *

(24)  To act as managing agents for other bodies or persons, whether corporate or not, to conduct enterprises and manage ventures of all types on their behalf.

(25)  To carry on any other business which may seem to * * * [Guardian Bank] capable of being conveniently carried on in connection with any business of * * * [Guardian Bank] or calculated directly to enhance the value of or render more profitable any of * * * [Guardian Bank's] property or assets.

* * * * * * *

(41)  To do all such other things which are incidental or * * * [that Guardian Bank] may think conducive to the attainment of the above objects or any of them.

In January of 1986, Guardian Bank obtained a banking license required under the laws of Montserrat authorizing it to engage in business as an offshore investment or agency bank.  Guardian Bank itself did not accept cash deposits from customers, nor did it maintain for its customers savings or checking accounts.  When Guardian Bank's customers desired to deposit funds with a bank in Montserrat, the funds would be transferred in the customers'

names to bank accounts with commercial banks in Montserrat with which Guardian Bank maintained correspondent relationships.

On October 16, 1986, petitioner formed Guardian Services as a Montserrat corporation for the stated purpose, as indicated in its articles of association or charter, of engaging primarily in real estate transactions and real estate development.

The charter of Guardian Services makes no mention of Guardian Bank or of Stanford Financial.

Under a written service agreement between Guardian Bank and Guardian Services, Guardian Services provided marketing and advertising services to Guardian Bank. The service agreement does not indicate that Guardian Services was to act as a nominee of or agent for Guardian Bank. The service agreement specified only that Guardian Services would perform routine marketing activities, such as the dissemination of information regarding Guardian Bank's activities. Nowhere in the service agreement is Guardian Services granted the authority to act in the name of or for the account of, or to bind by its actions, Guardian Bank. Guardian Services held itself out to the public as a separate affiliate of Guardian Bank, and when asked by customers of Guardian Bank for financial statements, Guardian Services presented its own financial statements to the customers, not the financial statements of Guardian Bank.

On February 3, 1987, Stanford Financial was incorporated as a Montserrat corporation. Upon incorporation of Stanford

Financial, substantially all of the shares of stock in Guardian Bank and in Guardian Services were transferred to Stanford Financial, and, as explained, Guardian Bank and Guardian Services became related to each other as brother/sister corporations with Stanford Financial as the parent corporation.

In its articles of association or charter, Stanford Financial's stated purpose was to act as a holding company and to provide administrative and management services, as follows:

(1) (a) To carry on the business of a Holding Company and to undertake and transact all kinds of agency business.

* * * * * * *

(3) To take part in the formation, management, supervision or control of the business or operations of any company or undertaking, and for that purpose to appoint and remunerate any directors, accountants, or other experts or agents.

* * * * * * *

(5) To act as managers or to direct the management of any * * * businesses or of any corporations or firms or on behalf of any person carrying on any * * * businesses and to act as directors of any company or as members of the boards of management of any corporations carrying on any such businesses.

Stanford Financial's articles of association or charter also authorized Stanford Financial to engage in the business of banking. There is no reference in Stanford Financial's charter to Guardian Bank or to Guardian Services.

During 1989 and 1990, pursuant to a service agreement that

allegedly existed between Guardian Bank and Stanford Financial, Stanford Financial provided administrative and management services to Guardian Bank. Stanford Financial provided no services to any other company.

Guardian Bank, Guardian Services, and Stanford Financial shared an office in Montserrat. Also, Guardian Bank maintained an administrative office in Mexia, Texas, and a representative office in Houston, Texas. Guardian Services maintained a representative office in Miami, Florida, and Stanford Financial maintained a representative office in Mexia, Texas.

A separate set of books and records was maintained for each of Guardian Bank, Guardian Services, and Stanford Financial.

Under Montserrat law, neither Guardian Services nor Stanford Financial obtained banking licenses, and therefore neither presumedly was permitted to engage directly in banking activity on behalf of Guardian Bank.

Because some banks in Montserrat engaged in disreputable banking practices, in the late 1980's, the Montserrat Government began considering and adopting policies and legislation restricting the activity of foreign owned banks in Montserrat. Specifically, the Montserrat Government began considering legislation that would preclude direct ownership of banks by foreign individuals and that would restrict direct marketing by or on behalf of foreign owned banks that were based in Montserrat.

Actual legislation in Montserrat, however, restricting activity of foreign owned banks and precluding ownership in Montserrat of banks by foreign individuals was not enacted until 1991.

In September of 1989, Hurricane Hugo struck Montserrat bringing with it 200-mile-an-hour winds that destroyed much of the island, including the shared office in Montserrat of Guardian Bank, Guardian Services, and Stanford Financial. All of the furniture in the office was destroyed, including a safe containing records of Guardian Bank, Guardian Services, and Stanford Financial.

On October 25, 1990, petitioners filed their 1989 joint Federal income tax return.

On March 18, 1991, petitioner filed a 1990 corporate Federal income tax return of Stanford Financial (Form 1120F), and on September 19, 1991, pursuant to automatic 6-month extensions of time for filing, petitioner filed 1990 corporate Federal income tax returns of Guardian Bank and of Guardian Services (Forms 1120F).

Petitioners requested and apparently received an automatic extension of time to file until August 15, 1991, their 1990 joint Federal income tax return. The evidence does not indicate when petitioners mailed to respondent their 1990 joint Federal income tax return. Although petitioners apparently signed their 1990 joint Federal income tax return on November 5, 1991, respondent

did not receive this return, along with a further extension request, until February 28, 1992.

On their 1990 joint Federal income tax return, petitioners reported subpart F income of, among other entities, Guardian Bank and deficits in the earnings and profits of Guardian Services and Stanford Financial, as follows:

|  | Subpart F Income | Deficits In Earnings & Profits |
|---|---|---|
| Guardian Bank | $2,789,722 | --- |
| Guardian Services | --- | ($1,251,891) |
| Stanford Financial | --- | ($ 154,474) |
| Total | $2,789,722 | ($1,406,365) |

As indirect owners of Guardian Bank and as required under section 951, petitioners reported on their 1990 joint Federal income tax return the above $2,789,722 subpart F income of Guardian Bank. On their 1990 joint Federal income tax return, petitioners also reduced this subpart F income of Guardian Bank by the above $1,406,365 total deficits in the 1990 earnings and profits of Guardian Services and of Stanford Financial.

On their 1990 joint Federal income tax return, petitioners also reported a $615,890 net operating loss carryforward deduction from 1989, which net operating loss arose, in part, from petitioners' reduction of reported 1989 $580,483 subpart F income of Guardian Bank by reported $385,386 total deficits in 1989 earnings and profits of Guardian Services and of Stanford Financial.

On audit, respondent disallowed petitioners' use for 1990 of the $1,406,365 total deficits in earnings and profits of Guardian Services and of Stanford Financial to reduce the $2,789,722 subpart F income of Guardian Bank.

Respondent also reduced the $615,890 net operating loss that petitioners carried forward from 1989 based on the disallowance of petitioners' use of the $385,386 total 1989 deficits in earnings and profits of Guardian Services and Stanford Financial to reduce the 1989 $580,483 subpart F income of Guardian Bank.

For 1990, respondent determined against petitioners a late filing addition to tax under section 6651(a)(1) and an accuracy-related penalty under section 6662(a).

## OPINION

Under subpart F of the Code, certain income (subpart F income) of U.S. controlled foreign corporations (CFC's) is to be included in income of U.S. shareholders of the CFC's regardless of whether the CFC's income is distributed currently to the U.S. shareholders. Sec. 951(a).

Under section 952(d), as applicable through 1986, U.S. shareholders with subpart F income were permitted to reduce subpart F income of profitable CFC's by deficits in earnings and profits of unprofitable CFC's that were part of a chain of controlled foreign corporations. This rule was referred to as the "chain deficit rule". As applicable through 1986, deficits

in earnings and profits of CFC's could be used to reduce subpart F income of U.S. shareholders regardless of the manner by which the profitable and the unprofitable CFC's were related to each other within the chain (i.e., regardless of whether the profitable and the unprofitable CFC's had a parent/subsidiary or a brother/sister relationship). Also, deficits in earnings and profits of CFC's could be used to reduce subpart F income of U.S. shareholders regardless of whether the various CFC's within the chain were engaged in similar or related business activity.[1]

In 1986, section 952(d) was repealed, effective for any year ending after 1986. Tax Reform Act of 1986, Pub. L. 99-514, sec.

---

[1]    Sec. 952(d), as applicable through 1986, provided, in part, as follows:

> **(d) Special Rule in Case of Indirect Ownership.--**For purposes of subsection (c) [limitation on Subpart F income], if--
>
>    (1) a United States shareholder owns * * * [directly or indirectly] stock of a foreign corporation, and by reason of such ownership owns * * * [directly or indirectly] stock of any other foreign corporation, and
>
>    (2) any of such foreign corporations has a deficit in earnings and profits for the taxable year,
>
> then the earnings and profits for the taxable year of each such foreign corporation which is a controlled foreign corporation shall, with respect to such United States shareholder, be properly reduced to take into account any deficit described in paragraph (2) in such manner as the Secretary shall prescribe by regulations.

See also sec. 1.952-1(d)(2), Income Tax Regs., as in effect through 1986.

1221(f), 100 Stat. 2554. The repeal was based generally on Congress' belief that the chain deficit rule in section 952(d) allowed U.S. taxpayers to shelter through CFC's excessive amounts of tax haven income from current U.S. tax. See H. Conf. Rept. 99-841, at 621-626 (1986), 1986-3 C.B. (Vol. 4) 473, 621-626.

In 1988, a new and revised chain deficit rule was enacted, retroactive to any year ending after 1986. Sec. 952(c)(1)(C); Technical and Miscellaneous Revenue Act of 1988 (TAMRA), Pub. L. 100-647, sec. 1012(i)(25)(A), 102 Stat. 3512. The TAMRA version of the chain deficit rule is the rule that governs in this case for 1990. The chain deficit rule, as enacted in 1988, provided new restrictions on the use of deficits in earnings and profits of CFC's to reduce subpart F income of profitable CFC's owned by U.S. shareholders.

In particular, under TAMRA, the new chain deficit rule provides that, in order to reduce subpart F income of profitable CFC's by deficits in earnings and profits of unprofitable CFC's, the profitable and unprofitable CFC's must satisfy a new "qualified chain member" rule and subpart F income of the profitable CFC's must be attributable to the same qualified activity to which deficits in earnings and profits of the unprofitable CFC's are attributable. Sec. 952(c)(1)(B) and (C).

CFC's constitute qualified chain members under section 952(c)(1)(C) only where the CFC's are related to each other directly or indirectly through a single, straight-line chain of

corporations, as in a parent-subsidiary relationship and not where the CFC's are related to each other through a common parent, as in a brother-sister relationship.  Section 952(c)(1)(C) provides, in part, as follows--

> **(C) Certain deficits of member of the same chain of corporations may be taken into account.--**
>
> > **(i) In general.--**A controlled foreign corporation may elect to reduce the amount of its subpart F income for any taxable year which is attributable to any qualified activity by the amount of any deficit in earnings and profits of a qualified chain member for a taxable year ending with (or within) the taxable year of such controlled foreign corporation to the extent such deficit is attributable to such activity. * * *
> >
> > **(ii) Qualified chain member.--**For purposes of this subparagraph, the term "qualified chain member" means, with respect to any controlled foreign corporation, <u>any other corporation</u> which is created or organized under the laws of the same foreign country as the controlled foreign corporation <u>but only if</u>--
> >
> > > (I) all <u>the stock of such other corporation * * * is owned</u> at all times during the taxable year in which the deficit arose (directly or <u>through 1 or more corporations other than the common parent</u>) by such controlled foreign corporation * * * [or vice versa].  [Emphasis added.]

With regard to the "same qualified activity" requirement of the TAMRA chain deficit rule, the business activity of the profitable and the unprofitable CFC's must arise from one of the same specified types of activity listed in section 952(c)(1)(B)(iii), as follows:

**(iii) Qualified activity.--**For purposes of this paragraph, the term "qualified activity" means any activity giving rise to--

(I) foreign base company shipping income,

(II) foreign base company oil related income,

(III) foreign base company sales income,

(IV) foreign base company services income,

(V) in the case of a qualified insurance company, insurance income or foreign personal holding company income, or

(VI) in the case of a qualified financial institution, foreign personal holding company income.

In summary, as the TAMRA chain deficit rule applies for 1990, subpart F income of profitable CFC's may only be reduced by deficits in earnings and profits of unprofitable CFC's if each of the CFC's is part of a "qualified chain" and if the subpart F income of the profitable CFC's and the deficits in the earnings and profits of the unprofitable CFC's relate to the same qualified activity.

We first address the legal issue of whether Guardian Bank and Guardian Services, as brother/sister corporations, qualify under the TAMRA chain deficit rule as members of the same qualified chain. Respondent contends that Guardian Bank and Guardian Services do not qualify as qualified chain members because petitioner's ownership interest in Guardian Bank and Guardian Services runs through a common parent corporation

(namely, Stanford Financial), which relationship, respondent argues, is expressly excluded from the definition of a qualified chain.

Petitioners' argument that Guardian Bank and Guardian Services qualify under the chain benefit rule of section 952(c)(1)(C) turns largely on one word in section 952(c)(1)(C)(ii). As indicated above, the cited statutory language makes reference to "the" common parent, and petitioners argue that the language "the" common parent should be construed to mean "the U.S. shareholders", not the foreign parent corporation (namely, not Stanford Financial).

Petitioners also rely on Treasury regulations applicable to the prior version of section 952, and thus applicable through the end of 1986, that have never been declared obsolete and that permitted the use of deficits in the earnings and profits of CFC's to reduce subpart F income of sister CFC's.

We believe the statutory language to be clear. In the instant case, Guardian Bank and Guardian Services are related to each other as brother/sister corporations only through Stanford Financial, the common parent. Consequently, Guardian Services does not constitute a "qualified chain member" with respect to Guardian Bank, and petitioners are not permitted to use deficits in earnings and profits of Guardian Services to reduce subpart F income of Guardian Bank.

The portion of the regulations on which petitioners rely (namely, sec. 1.952-1(d)(2)(ii), Income Tax Regs.) and which is inconsistent with section 952(c)(1)(C)(ii), as amended in 1988 and as applicable to 1990, is not applicable to years such as 1990 for which the new TAMRA chain deficit rule is applicable. This portion of the regulations construes the prior law and has not been amended to take account of the new chain deficit rule. The statutory language of section 952(c)(1)(C) expressly disqualifies as "qualified chain members" CFC's that are related to each other through a common parent corporation (i.e., that are related as brother/sister corporations).

With regard to deficits in earnings and profits of Stanford Financial, respondent acknowledges that Guardian Bank and Stanford Financial, as subsidiary/parent corporations, qualify as members of a "qualified chain" under section 952(c)(1)(C)(ii), as enacted by TAMRA and as applicable to 1990. Respondent also acknowledges that the subpart F income of Guardian Bank constitutes foreign personal holding company income and that Guardian Bank constitutes a qualified financial institution because Guardian Bank was actively engaged in the activity of banking and financing under section 952(c)(1)(B)(iii)(VI) and 952(c)(1)(B)(vi). Respondent argues, however, that Stanford Financial was not also engaged in the banking, financing, or similar business, but in the management business.

Section 1.864-4(c)(5)(i), Income Tax Regs., dealing with foreign sources of income, describes those activities that are indicative of banking, financing, and similar businesses, as follows:

(i) Definition of banking, financing, or similar business.--

* * * * * * *

(a)  Receiving deposits of funds from the public,

(b)  Making personal, mortgage, industrial, or other loans to the public,

(c)  Purchasing, selling, discounting, or negotiating for the public on a regular basis, notes, drafts, checks, bills of exchange, acceptances, or other evidences of indebtedness,

(d)  Issuing letters of credit to the public and negotiating drafts drawn thereunder,

(e)  Providing trust services for the public, or

(f)  Financing foreign exchange transactions for the public.

The above description of the business of banking and finance -- originally contained in the foreign tax credit regulations of section 904 (sec. 1.904-4(c)(1), Income Tax Regs.) -- applies generally to CFC's for purposes of the "same or similar activity" requirement of the TAMRA section 952 chain deficit rule.  See S. Rept. 100-445, at 275-276 (1988).

Petitioners argue, among other things, that employees of Stanford Financial were involved on behalf of Guardian Bank, in bank management, the filing of bank regulatory compliance reports, and other duties incidental, necessary, and similar to

the banking activity of Guardian Bank.

The credible evidence before us, however, is sparse and establishes only that Stanford Financial performed administrative and management support services for Guardian Bank. It does not establish that Stanford Financial engaged in any banking or financing activity described in section 1.864-4(c)(5)(i), Income Tax Regs. Administrative and management services of the generalized type conducted by Stanford Financial do not qualify as banking or financing activity for this purpose. Stanford Financial did not have a banking license.

Petitioners also argue that Stanford Financial provided services to Guardian Bank "similar" to the business of banking. We are not persuaded on this record that the administrative and management services performed by Stanford Financial for Guardian Bank qualify as activities similar to those of a banking or financing business.

The manner by which petitioner structured the ownership relationship between Guardian Bank, Guardian Services, and Stanford Financial, as petitioners allege, may have related to anticipated changes in the laws of Montserrat relating to banking. On the evidence before us, however, anticipated changes in Montserrat law do not provide a sufficient basis to ignore differences between the banking activity of Guardian Bank and the administrative and management activities of Stanford Financial.

We conclude that Stanford Financial was not engaged in a

banking, financing, or similar business and therefore that the subpart F income of Guardian Bank may not be reduced by deficits in the earnings and profits of its parent corporation, Stanford Financial.

In the alternative, petitioners cite Commissioner v. Bollinger, 485 U.S. 340 (1988), and National Carbide Corp. v. Commissioner, 336 U.S. 422 (1949), and petitioners argue that Guardian Services and Stanford Financial should be treated as mere agents of Guardian Bank and that Guardian Services' and Stanford Financial's 1989 and 1990 deficits in earnings and profits should simply be treated as expenses or losses of Guardian Bank.

Under Montserrat law, neither Guardian Services nor Stanford Financial obtained banking licenses and therefore neither presumedly was permitted to engage directly in banking activity on behalf of Guardian Bank.

As we have found, in its advertisements, Guardian Services represented that it was an "affiliate" of Guardian Bank, not a nominee or agent thereof. The employees of Guardian Services provided customers of Guardian Bank with Guardian Services' own financial statements and not those of Guardian Bank. The service agreement between Guardian Bank and Guardian Services did not indicate that Guardian Services was a nominee or agent of Guardian Bank. The service agreement specified only that Guardian Services would perform marketing activities for Guardian

Bank.  Nowhere in the service agreement is Guardian Services granted the authority to act in the name of or for the account of, or to bind by its actions, Guardian Bank.

Petitioners' 1990 joint Federal income tax return indicates no agency relationship between Guardian Bank and Guardian Services.

With regard to Stanford Financial, the evidence does not indicate that Stanford Financial ever acted specifically in the name of or for the account of Guardian Bank, nor that it ever bound Guardian Bank by its actions.

Stanford Financial performed services for Guardian Bank of an administrative and management nature.

The alleged service agreement between Guardian Bank and Stanford Financial is insufficient to establish the existence of an agency relationship between Guardian Bank and Stanford Financial.

Based on our analysis of the evidence before us, we conclude that neither Guardian Services nor Stanford Financial is properly to be regarded as an agent of Guardian Bank; rather they are to be regarded as separate entities.  Accordingly, their separate deficits in earnings and profits are not to be treated as expenses or losses of Guardian Bank.

Addition to Tax and Accuracy-Related Penalty

Section 6651(a)(1) imposes an addition to tax for taxpayers'

failure to timely file income tax returns by the due date of the returns unless that failure is due to reasonable cause. To establish reasonable cause, taxpayers must show that they exercised ordinary business care and prudence but were still unable to file their returns by the due date. Sec. 301.6651-1(c)(1), Proced. & Admin. Regs. Whether the untimely filing of tax returns is due to reasonable cause raises a question of fact. Denenburg v. United States, 920 F.2d 301, 303 (5th Cir. 1991).

Section 6662(d) imposes a penalty for substantial understatements of tax but provides that the amount of any understatements shall be reduced by that portion that is attributable to either (1) the tax treatment of any item for which there was substantial authority or (2) any item if the relevant facts affecting the item's tax treatment are adequately disclosed in the returns or in statements attached to the returns. Sec. 6662(d)(2)(B).

Petitioners argue that the delay in filing their 1990 joint Federal income tax return was due to reasonable cause based on the destruction by Hurricane Hugo of records of Guardian Bank, Guardian Services, and Stanford Financial that were necessary to properly prepare and file their 1990 joint Federal income tax return and that extra time was needed to reconstruct these records.

Petitioners, however, offer no argument regarding the 4-month delay between November 5, 1991, the day they signed their

1990 joint Federal income tax return and February 28, 1992, the day respondent received the return.

We note that even though Hurricane Hugo occurred in September of 1989, on October 25, 1990, petitioners were able to file their 1989 joint Federal income tax return and, in the fall of 1991, petitioner was able to file the 1990 Federal corporate income tax returns of Guardian Bank, Guardian Services, and Stanford Financial.  Consequently, it appears that the records arguably destroyed by Hurricane Hugo had been reconstructed by the fall of 1991.  Petitioners, however, failed to file their 1990 joint Federal income tax return until February 28, 1992, more than 5 months after records that petitioners needed to complete their 1990 joint Federal income tax return apparently had become available.  Petitioners' argument based on the destruction of records, therefore, does not provide reasonable cause for the untimely filing of their 1990 joint Federal income tax return.

With respect to the accuracy-related penalty, respondent argues that no substantial authority existed for petitioners to use deficits in earnings and profits of Guardian Services and Stanford Financial to reduce the subpart F income of Guardian Bank.

If the Court concludes that petitioners' interpretation of the chain deficit rule and petitioners' application of that rule

to their CFC's are rejected, petitioners argue that because the relevant provisions of section 952 are so technical and unclear, it was not unreasonable for them to have adopted the interpretation they utilized in preparing and filing their 1990 joint Federal income tax return. Petitioners also argue that they satisfied the disclosure rules and provided sufficient information on their 1990 joint Federal income tax return regarding their CFC's to put respondent on notice of the basis for their claimed tax treatment of their subpart F income.

We agree with respondent that no substantial authority existed to support petitioners' reading of section 952.

With respect to disclosure, we agree with respondent that petitioners failed adequately to disclose facts necessary for respondent to determine the proper tax treatment of the subpart F income reported on petitioners' 1990 joint Federal income tax return.

We sustain respondent's impositions of the addition to tax for petitioners' untimely filing of their 1990 joint Federal income tax return and the accuracy-related penalty.

To reflect the foregoing,

<u>Decision will be entered</u>

<u>for respondent</u>.