109 T.C. No. 18


UNITED STATES TAX COURT


JOYCE ASTON, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 26105-95.               Filed December 4, 1997.


On July 5, 1991, banking regulators seized the assets of the Bank of Commerce and Credit International, S.A. (BCCI, S.A.), including funds that petitioner (a United Kingdom citizen and U.S. resident) deposited at BCCI, S.A.'s Isle of Man branch (IOMB).  Petitioner's account was insured for loss up to 15,000 pounds sterling by the Isle of Man Depositor's Compensation Scheme.  Petitioner filed a claim against BCCI, S.A. for her funds.

At all relevant times BCCI, S.A. maintained an agency office in Los Angeles.

Petitioner deducted $185,493.79 as a loss from an insolvent financial institution pursuant to sec. 165(l)(1), I.R.C., on her 1991 U.S. Federal income tax return.  The $185,493.79 represented the final balance of her IOMB account, less the 15,000 pounds sterling insurance.

1.   Held: Neither BCCI, S.A., its IOMB, nor its Los Angeles agency office meets the statutory requirements for "qualified financial institution" pursuant to sec. 165(l)(3), I.R.C.  Accordingly, petitioner is not entitled to a casualty loss in 1991.

2.   Held, further:  In light of the pendency of petitioner's claim in the liquidation of BCCI, S.A., petitioner is not entitled to a bad debt deduction pursuant to sec. 166, I.R.C., for 1991, the year the funds were seized, because she failed to prove that the deposit became worthless during that year.

Carol P. Schaner and Paul W. Raymond, for petitioner.

Louis B. Jack, for respondent.

JACOBS,  Judge:  Respondent  determined  the  following deficiencies in petitioner's Federal income taxes:

| Year | Deficiency |
|------|-----------|
| 1988 | $37,775 |
| 1989 | 2,690 |
| 1991 | 10,258 |

The issues for decision are: (1) Whether petitioner incurred a loss on a deposit in a "qualified financial institution" within the meaning of section 165(l)(3) and, if petitioner's loss does not come within the purview of section 165(l), then (2) whether petitioner incurred a deductible  nonbusiness bad debt pursuant to section 166.

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years under consideration.

All Rule references are to the Tax Court Rules of Practice and Procedure.

Some of the facts have been stipulated and are found accordingly. The stipulation of facts and attached exhibits are incorporated herein by this reference.

FINDINGS OF FACT

Petitioner resided in Long Beach, California, at the time she filed the petition.

Petitioner is a citizen of the United Kingdom. After working as a secretary, petitioner joined the Royal Navy, where she met Gordon Aston. They married in 1946. Petitioner and her husband originally resided in Manchester, England. Petitioner stayed at home for several years to care for their two children, and subsequently attended a training college for teachers. Petitioner became a college instructor. Her husband was a police officer with the Manchester City Police Force.

In 1972, Mr. Aston retired and moved with petitioner to the Isle of Man, off the coast of England. At that time, petitioner's daughter resided in the United States.

In 1977, petitioner's son moved to the United States. In 1979, petitioner and her husband sold their house on the Isle of Man and moved to California to be closer to their children.

Until his death on December 31, 1984, petitioner's husband handled the couple's financial affairs.

1.  The Bank of Commerce and Credit International, S.A.

The Bank of Commerce and Credit Holdings, S.A.[1] (Luxembourg) (hereinafter BCCI) was organized, chartered, and headquartered in Luxembourg.  BCCI was established in 1972 by Agha Hasan Abedi, a Pakistani banker, who feared the imminent nationalization of Pakistan's banks.  BCCI's principal investors resided in Abu Dhabi.  Bank of America also maintained a 30-percent stake in the venture, in an effort to increase its banking ties in the Middle East.

BCCI had two operating subsidiaries: the Bank of Commerce and Credit International, S.A.  (BCCI, S.A.), organized and headquartered in Luxembourg, and the Bank of Commerce and Credit International, S.A. Cayman Islands (BCCI Cayman Islands), organized and headquartered in the Cayman Islands. BCCI chartered its operating subsidiaries in Luxembourg and the Cayman Islands because those jurisdictions are considered tax havens; moreover, they contain no central bank and minimal bank regulation.  Over the years, BCCI established approximately 350 offices throughout the Middle East, Africa, Latin America, and Asia.

BCCI and its operating subsidiaries were "foreign banks" within the meaning of title 12 of the U.S. Code, Banks and Banking, section 3101(7) (1994).  Pursuant to title 12, a foreign bank can be licensed to do business in the United States in one of four

---

[1]     "S.A." is the French equivalent to "Inc.", an abbreviation of "Societe Anonyme", the French word for corporation.

ways: (1) As a "subsidiary"; (2) as a fully insured "branch"; (3) as an "agency"; or (4) as a "representative".

At various times during its years of operation, BCCI, S.A. maintained agency offices in New York City, Los Angeles, and San Francisco; BCCI Cayman Islands maintained agency offices in Miami, Tampa, and Boca Raton. For a limited time BCCI, S.A. had a representative office in Washington, D.C. (A representative office is the lowest grade of banking offices. It is prohibited from doing routine banking transactions and primarily serves a local public relations function for the home office of the bank.) As part of its worldwide branch[2] structure, BCCI, S.A. maintained a branch on the Isle of Man (IOMB).

BCCI, S.A.'s agency offices[3] in the United States were not permitted to exercise fiduciary or trust powers under Federal or State law. The U.S. agency offices also were prohibited from

---

[2]     "Branch" is defined pursuant to 12 U.S.C. sec. 3101(3) (1994), as "any office or any place of business of a foreign bank located in any State of the United States at which deposits are received."

[3]     "Agency" is defined pursuant to 12 U.S.C. sec. 3101(1) (1994), as follows:

> any office or any place of business of a
> foreign bank located in any State of the
> United States at which credit balances are
> maintained incidental to or arising out of
> the exercise of banking powers, checks are
> paid, or money is lent but at which deposits
> may not be accepted from citizens or
> residents of the United States. * * *

accepting deposits from U.S. residents or citizens.  However, BCCI, S.A. and its IOMB could accept deposits from U.S. citizens and residents.

Deposits to BCCI, S.A., its U.S. agency offices, and the IOMB were not insured under U.S. State or Federal law.  Deposits to the IOMB of BCCI, S.A. were insured by the Bank of England under United Kingdom law.

## 2.  BCCI Acquisitions

In 1975, U.S. banking regulators blocked BCCI's attempt to purchase Chelsea National Bank in New York.  BCCI officials were informed that the Federal Reserve Board would never approve BCCI's direct acquisition of a U.S. bank.

BCCI thereafter launched a plan to acquire control of several U.S. banks through a nominee known as Credit and Commerce American Holdings, Netherlands Antilles (CCAH). In 1978, CCAH began acquiring a controlling interest in Financial General Bankshares (FGB), a multibank holding company with subsidiary banks in Washington, D.C., Maryland, New York, Tennessee, and Virginia. The purchase was finalized in 1982.

In 1983, First American Bank (FAB) acquired two branches of Banker's Trust in Manhattan, which were renamed FAB of New York. Approximately 47 branches, subsidiaries, and affiliates of BCCI maintained U.S. dollar accounts at FAB of New York.

Between 1977 and 1987, a BCCI nominee purchased the National Bank of Georgia.

Although BCCI never directly owned any U.S. banks, it controlled a number of banks in New York, Maryland, Georgia, California, and Florida.

In 1990, BCCI officials pleaded guilty to money laundering charges involving wire transfers between Panama and BCCI-Panama's account at FAB of New York.

3. Supervision of BCCI, S.A.

BCCI, S.A. was initially supervised by the Luxembourg Monetary Institute. As the bank grew--spreading to approximately 72 countries--the Luxembourg authorities became concerned about their ability to supervise BCCI effectively. Because of perceived irregularities in the European branches of BCCI, S.A., a "college of supervisors" was established in the late 1980's. The supervisors consisted of bank regulators from England, the Cayman Islands, Luxembourg, and several other European countries. They attempted to create a consolidated and accurate picture of BCCI's operations. Bank regulators from the United States were not invited to join this group.

At the time BCCI's operating subsidiaries opened their agency offices in the United States, no approval from any Federal banking authority (such as the Federal Reserve Board) was required. The only approval required was a license from State banking regulators.

BCCI, S.A. obtained approval from banking regulators in California and New York for the establishment of agency offices in those States, and BCCI Cayman Islands obtained approval from the banking regulators in Florida for the establishment of agency offices there.

The Federal Reserve Board had limited supervisory authority over BCCI's U.S. agency offices. It was authorized to supervise only the U.S. activities of the agency offices. The Federal Reserve Board did not have: (1) Access to the bank's worldwide records; (2) authority to go outside the United States to make any determination regarding the bank's overall structure; or (3) authority to obtain information concerning the asset quality capital of the bank as an entirety.

In response to the lack of Federal control over BCCI's operations in the United States, Congress enacted the Federal Deposit Insurance Corporation Improvement Act of 1991, Pub. L. 102-242, sec. 202, 105 Stat. 2286. This law requires foreign banks to obtain approval from the Federal Reserve Board before conducting business in the United States. It also requires foreign banks to provide Federal regulators access to information regarding their worldwide operations.

4. Petitioner's Bank Accounts

On June 20, 1980, petitioner and her husband opened account No. 03000571 at the IOMB of BCCI, S.A., depositing 54,125 pounds

sterling into a 6-month certificate of deposit. The deposit represented the proceeds from the sale of their Isle of Man house.

During the 10 years following this initial deposit, only one partial withdrawal was made from this account (discussed infra). With that exception, petitioner and her husband allowed the interest and principal to roll over into successive certificates of deposit. By their own terms, the certificates of deposit were "automatically renewed with interest", absent written instructions to the contrary from petitioner.

Petitioner's account No. 03000571 was a "no correspondence" account. As such, except upon request, the IOMB of BCCI, S.A. generally did not send statements or other paperwork to petitioner's residence.

In addition to account No. 03000571, Mr. Aston opened at least one other account at the IOMB of BCCI, S.A. (account No. 02013325). The full extent of the Astons' relationship with BCCI, S.A. is unclear from the record; however, the claimed loss at issue arises solely from the funds held in account No. 03000571. Petitioner also maintained accounts at the Isle of Man branches of Lombard Bank and Barclay's Bank. The Barclay's account was opened when petitioner and her husband first moved to the Isle of Man. It is unclear when the Lombard account was opened.

Following her husband's death, petitioner made one withdrawal from account No. 03000571 to purchase a residential unit in

Florida.  This was to be a retirement home for petitioner's son and his wife, as well as for petitioner, if she were still living.

5.  Seizure of BCCI's World-Wide Assets

Early on in BCCI's existence it began to experience substantial losses due to improper banking practices, including illicit activities conducted by BCCI employees and customers.  For many years, BCCI was able to keep the nature and extent of these losses hidden.   However by 1991, BCCI's losses had become the subject of scrutiny by bank supervisors in several countries.

On June 6, 1990, the Federal Reserve Board received from the Bank of England a Price Waterhouse audit report for BCCI, indicating a nominee relationship between CCAH and BCCI.  The Price Waterhouse audit report found that there were approximately $1.7 billion in outstanding, nonperforming loans from BCCI to eight CCAH shareholders secured by CCAH stock.

On June 11, 1990, BCCI sent a letter to the Federal Reserve Board stating that it intended to close all U.S. BCCI offices except New York.  On June 12, 1990, the New York Reserve Bank suggested that BCCI cease all operations in the United States.  On July 11, 1990, BCCI was instructed not to shift any assets to the New York agency.

On July 5, 1991, BCCI's worldwide assets, including those of the IOMB of BCCI, S.A., were seized. The Luxembourg Monetary Institute took control of the assets of BCCI, S.A., while the

inspector of Banks and Trust Companies of the Cayman Islands took control of the assets of BCCI Cayman Islands.

On July 29, 1991, the Federal Reserve Board began enforcement proceedings against BCCI, the BCCI subsidiary banks in Luxembourg and the Cayman Islands, and a Cayman Islands bank related to BCCI, for violations of U.S. banking laws. The Federal Reserve Board found that BCCI had, inter alia, illegally obtained control over several U.S. banking organizations through the use of nominee shareholders. All BCCI offices in the United States were seized and the various U.S. banks it controlled were ordered to terminate their relationship with BCCI. At this time, the superintendents of banks for California and New York took control of the assets of the California and New York agencies of BCCI.

Following BCCI's closure, "Court Appointed Fiduciaries" were selected to identify and manage BCCI's assets in preparation for their liquidation. In December 1991, the court-appointed fiduciaries pleaded guilty (on behalf of BCCI) to various violations of Federal and State laws. In 1992, the District Court in Luxembourg, the High Court of Justice in the United Kingdom, and the Grand Court of the Cayman Islands, ordered the formal liquidation of BCCI. At the time of the trial herein, BCCI was still in the process of liquidation.

6. Petitioner's Claims Against BCCI, S.A.

At the time the deposits at the IOMB of BCCI, S.A. were seized, petitioner's account had a balance of 129,608.46 pounds sterling (equivalent to US$209,771.29 under the prevailing exchange rate[4]). Accordingly, as of January 3, 1992, petitioner and Mr. Aston had a claim balance of 129,608.46 pounds sterling against BCCI, S.A. (in liquidation).

A. Isle of Man Depositors' Compensation Scheme

The Isle of Man Depositors' Compensation Scheme notified petitioner by letter dated January 20, 1992, that she could file a claim for depositors' insurance. (Petitioner's account at the IOMB of BCCI, S.A. was insured by the Bank of England (through the Isle of Man Depositors' Compensation Scheme) for up to 15,000 pounds sterling.) Sometime between March and June 1992, petitioner filed a claim with the Isle of Man Depositors' Compensation Scheme for a loss regarding account No. 03000571 at the IOMB of BCCI, S.A. The 15,000 pounds sterling to which petitioner was entitled from the Isle of Man Depositors' Compensation Scheme reduced petitioner's maximum potential loss to 114,608.46 pounds sterling (or $185,493.79). In 1993, petitioner received at least 9,000 pounds sterling from the Isle of Man Depositors' Compensation Scheme.

---

[4]  Hereinafter, a dollar sign ($) refers to U.S. dollars.

B.  Proof of Debt Claims

On January 15, 1992, the IOMB of BCCI, S.A. was placed into liquidation by the High Court in Douglas, Isle of Man.  By letter dated March 1992, the BCCI liquidator advised potential creditors, including petitioner, of the procedures for filing proof of debt claims.  Proofs of debt had to be filed before June 30, 1992.

Petitioner filed two claims in the IOMB of BCCI, S.A. liquidation, one for each of her BCCI accounts.  By letters dated December 10, 1996, the liquidator advised petitioner that a 24.5-percent "first dividend" was declared, from which petitioner would be paid $753.46 for account No. 02013325 and $67,703.42 for account No. 03000571.

Separate liquidations were also conducted for BCCI, S.A.'s operations in California and New York.  All creditors in the California and New York liquidations were fully paid (100 percent). Petitioner did not file a claim in the California liquidation.

C.  "Victims Fund"

Sometime in 1995 petitioner's tax return preparer, Patricia Vannucci, read a newspaper article indicating that a U.S. District Court judge had ordered $393 million seized from BCCI to be turned over to a worldwide "victims fund" to compensate depositors and other third parties harmed by BCCI.  On September 7, 1995, Ms.

Vannucci faxed the article to petitioner's attorney, Carol P. Schaner. Thereafter, Ms. Schaner attempted to obtain compensation for petitioner from this worldwide "victims fund". Ms. Schaner received no response to her correspondence.

7. Petitioner's Federal Income Tax Returns

Petitioner did not initially report the interest income earned by any of her Isle of Man accounts on her Federal income tax returns.[5] In October 1991, petitioner's accountant prepared amended returns for petitioner's 1985-90 tax years to report interest income from her Isle of Man accounts. These amended returns were mailed to the Internal Revenue Service on November 26, 1991.

Petitioner deducted $185,493.79 as a loss arising from an insolvent financial institution pursuant to section 165(l) on her 1991 Federal income tax return. Petitioner claimed this loss as a result of the seizure of her account No. 03000571 at IOMB of BCCI, S.A. As a result of this deduction, petitioner filed second amended returns for 1988 and 1989, claiming net operating loss carrybacks of $143,209 and $4,455, respectively.

---

[5] Her original 1989 return, for example, neither discloses the existence of the Isle of Man accounts nor reports any interest income.

8.  Notice of Deficiency

On September 18, 1995,[6] respondent mailed a notice of deficiency to petitioner determining deficiencies for her 1988, 1989, and 1991 tax years. The notice of deficiency disallowed the 1991 section 165(l) deduction and resultant net operating loss carrybacks.

OPINION

Issue 1.  Loss Arising From Qualified Financial Institution

Petitioner, along with her deceased husband, lost funds on deposit in the infamous BCCI fiasco and claimed a casualty loss under section 165(c)(3).  The gist of this case is whether BCCI, S.A. is a "qualified financial institution" within the meaning of section 165(l)(3).

Section 165(l) provides special treatment to certain losses caused by deposits in insolvent financial institutions.  See Fincher v. Commissioner, 105 T.C. 126 (1995).  If its statutory prerequisites are met, section 165(l) permits individuals to treat a loss on a deposit as a casualty loss in the year the loss amount

---

[6]    On Oct. 5, 1995, respondent mailed a duplicate notice of deficiency to petitioner for tax years 1988, 1989, and 1991. The second notice of deficiency corrected a typographical error in the date of the original notice of deficiency (erroneously dated Sept. 18, 1996).  Apart from the dates, the two notices are identical.

can be reasonably estimated. This option may be elected as an alternative to the bad debt provisions of section 166, which treat a loss on a deposit in an insolvent financial institution as a short-term capital loss deductible only in the year in which there is no reasonable prospect of recovery. Electing casualty loss treatment forecloses any section 166 bad debt deduction. An individual's election of casualty loss treatment applies to all of the individual's deposits in the same financial institution.

Section 165(l) provides, in pertinent part, as follows:

(l) Treatment of Certain Losses in Insolvent Financial Institutions.--

(1) In general.--If--

(A) as of the close of the taxable year, it can reasonably be estimated that there is a loss on a qualified individual's deposit in a qualified financial institution, and

(B) such loss is on account of the bankruptcy or insolvency of such institution,

then the taxpayer may elect to treat the amount so estimated as a loss described in subsection (c)(3) incurred during the taxable year.

\* \* \* \* \* \* \*

(3) Qualified financial institution.-- For purposes of this subsection, the term "qualified financial institution" means--

> (A) any bank (as defined in section 581),
>
> (B) any institution described in section 591,
>
> (C) any credit union the deposits or accounts in which are insured under Federal or State law or are protected or guaranteed under State law, or
>
> (D) any similar institution chartered and supervised under Federal or State law.
>
> (4) Deposit.--For purposes of this subsection, the term "deposit" means any deposit, withdrawable account, or withdrawable or repurchasable share.

The parties agree that petitioner is a "qualified individual" pursuant to section 165(l). Cf. Fincher v. Commissioner, supra. Petitioner bears the burden to prove that the remaining statutory requirements are met. Rule 142(a).

Preliminarily, we must determine the specific financial institution where petitioner's funds were "on deposit". We must then determine whether that institution was "qualified" within the meaning of section 165(l)(3).

Petitioner argues that she had an account at BCCI, S.A. in Luxembourg or the Los Angeles agency office of BCCI, S.A. Respondent argues that petitioner's account was at the IOMB of BCCI, S.A. Because the following analysis determines that none of

these entities meet the statutory requirements of a "qualified financial institution", we need not determine the exact location of petitioner's deposit.[7]

Although petitioner concedes that neither BCCI, S.A., its IOMB, nor its Los Angeles agency office satisfy section 165(l)(3)(A), (B), or (C), we nonetheless must examine these provisions to determine the meaning of the term "similar institution" under section 165(l)(3)(D).

### a. Not a Bank

The first "qualified financial institution" described in subsection 165(l)(3) is a bank. Section 581 defines a bank as:

> a bank or trust company incorporated and doing business under the laws of the United States * * * or of any State, a substantial part of the business of which consists of receiving deposits and making loans and discounts, or of exercising fiduciary powers similar to those permitted to national banks under authority of the Comptroller of the Currency, and which is subject by law to supervision and examination by State, or Federal authority having supervision over banking institutions. * * *

---

[7] We also need not determine whether the sec. 165(l) analysis should be applied in this case on an office-by-office basis (as implied by both petitioner's and respondent's positions) or on an institution-wide basis because in either case we would not hold that petitioner's deposits were maintained in a qualified financial institution.

With respect to the instant case, none of the three entities (BCCI, S.A, its IOMB, or its Los Angeles agency office) meet the section 581 statutory definition of a bank. First, neither BCCI, S.A. nor its IOMB was incorporated under the laws of the United States or of any State. BCCI, S.A.'s Los Angeles agency office was also not incorporated in the United States or California. (Under the law in effect at the time, the Los Angeles agency office operated under limited supervision by Federal banking authorities and was merely licensed by California banking authorities to conduct business in California.)

Second, although a "substantial part" of the business of BCCI, S.A. and its IOMB involved the receipt of deposits from U.S. citizens,[8] petitioner did not introduce evidence to establish that any of these three entities could make loans or exercise fiduciary powers, or that even if they could make loans or exercise fiduciary powers, such activities constituted a "substantial part" of their business. In addition, the Los Angeles agency office of BCCI, S.A. was prohibited from accepting deposits from U.S. residents or

---

[8]   Richard Small, special counsel at the Board of Governors of the Federal Reserve System in Washington, D.C., testified to this effect.

citizens.  Thus, as a U.S. resident, petitioner was prohibited from depositing funds in the Los Angeles agency office of BCCI, S.A.[9]

Third, neither BCCI, S.A. nor its IOMB was subject to supervision and examination by Federal or State banking officials. Although the Los Angeles agency office of BCCI, S.A. was licensed by California and its U.S. activities were supervised by the Federal Reserve Board, BCCI itself was not subject to supervision and examination.  Records pertaining to the central bank were not available to Federal and State regulators.  In fact, to the limited extent the college of regulators scrutinized BCCI, U.S. regulators were excluded.

In sum, because the requirements of section 581 are in the conjunctive, neither BCCI, S.A., its IOMB, nor its Los Angeles agency office qualifies as a "bank" under section 165(l)(3)(A).

---

[9]     We do not construe the fact that petitioner may have been able to withdraw funds from her IOMB of BCCI, S.A. account at the Los Angeles agency office of BCCI, S.A. to mean that her funds were "on deposit" in the Los Angeles agency office of BCCI, S.A.  (For example, an individual with an account at the Orange County Federal Employees Credit Union is able to withdraw funds from that credit union account through an ATM machine at Barclay's Bank in London.  The fact that the funds in the California credit union account can be accessed at the Barclay's Bank in London does not mean that the funds at the credit union are "on deposit" at Barclay's Bank.)

b.  Not a Savings and Loan

Through section 591, subsection 165(l)(3)(B) refers to "mutual savings banks, cooperative banks, domestic building and loan associations, and other savings institutions chartered and supervised as savings and loan or similar associations under Federal or State law".  None of the three entities fit within these categories.  Petitioner has failed to introduce any evidence that either BCCI, S.A., its IOMB, or its Los Angeles agency office qualifies under subsection 165(l)(3)(B).

c.  Not a Credit Union

Subsection 165(l)(3)(C) refers to credit unions whose deposits are insured under Federal or State law.  The evidence before us clearly establishes that deposits at BCCI, S.A., its IOMB, and its Los Angeles agency office were not insured under Federal or State law.  Accordingly, the three institutions do not qualify as credit unions under subsection 165(l)(3)(C).

d.  Not a Supervised and Chartered "Similar Institution"

Subsection 165(l)(3)(D) provides a final exception for "any similar institution" that is chartered and supervised under Federal or State law.  In order to be a "qualified financial institution" under section 165(l)(3)(D), an entity must be (1) supervised under

Federal or State law, (2) chartered under Federal or State law, and
(3) a "similar institution".[10]

All three institutions (BCCI, S.A., its IOMB, and its Los
Angeles agency office) do not meet the statutory requirements of a
"similar institution". First, neither BCCI, S.A. nor its IOMB was
supervised under Federal or State law. ("Supervise" refers to a
comprehensive scheme of regulation. See, e.g., Cal. Fin. Code,
secs. 99-3900 (1989). BCCI, S.A. was initially supervised by the
Luxembourg Monetary Institute. The college of regulators was
subsequently established, but the United States was specifically
excluded from this group. It appears that the IOMB of BCCI, S.A.
was most likely supervised under British law.)

At the time BCCI, S.A. was operating its agency offices in the
United States, the Federal Reserve Board had limited supervisory
authority over these operations. The Federal Reserve Board did not
have the authority to grant or deny permission to a foreign bank to
do business in the United States or to obtain and review the
records of a foreign bank's worldwide operations.[11] Moreover,

---

[10] The legislative history of sec. 165(l) does not shed
light on the meaning of sec. 165(l)(3)(D).

[11] These were among the powers that Congress later granted
to the Federal Reserve Board in the Federal Deposit Insurance
Corporation Improvement Act of 1991, Pub. L. 102-242, sec. 202,
(continued...)

agency offices were required to obtain a license from State banking regulators.

Second, the parties have stipulated that neither BCCI, S.A. nor its IOMB was "chartered under Federal or State law". The term "chartered" as used in section 165(l)(3)(D) is not defined in the Internal Revenue Code, the regulations, or the legislative history. For general legal purposes, however, the term "charter" is equivalent to granting permission to organize; i.e., it refers to the laws under which a bank is organized together with its articles of incorporation. See, e.g., Cal. Corp. Code secs. 191(d), 202 (1989); Stanford v. Commissioner, 108 T.C. 344, 345 (1997) ("In its articles of association or charter, Guardian Bank's stated business purpose"); Liberty Natl. Co. v. Commissioner, 18 B.T.A. 510, 512 (1929) ("Each was created for certain definite purposes set forth in its charter or articles of incorporation"), revd. on a different

---

[11](...continued)
105 Stat. 2286. Congress' expansion of the Federal Reserve Board's powers in the 1991 legislation underlines the lack of Federal supervisory power in previous years, including the years at issue.

issue 58 F.2d 57 (10th Cir. 1932)[12]; Black's Law Dictionary 236 (6th ed. 1990).

The charter of a bank is granted by the jurisdiction in which the bank is created. When a bank seeks to directly do business in a foreign jurisdiction (whether another State or country), it receives a license to conduct business in the foreign jurisdiction. It does not receive a charter. Clearly, neither BCCI, S.A. nor its IOMB was chartered under Federal or State law.

Petitioner contends, however, that the Los Angeles agency office of BCCI, S.A. was chartered in California. Petitioner observes that BCCI, S.A. filed an application to do business in California, and argues that the application "presumably" included a copy of its charter.

Under California law, a foreign bank does not derive its existence and general authority to operate from California. The foreign bank is merely licensed[13] by the State to exercise some of the authority granted by the bank's original charter. See Cal.

---

[12] Similarly, Rev. Rul. 90-54, 1990-2 C.B. 270, 271, which considered the difference between a bank and savings association, stated that "the charter is the source of an institution's existence and its right to conduct business."

[13] A "license" is the permission to do or carry on some trade or business which would otherwise be unlawful. Black's Law Dictionary 920 (6th ed. 1990).

Fin. Code, secs. 400, 401, 1753 (1989). Although BCCI, S.A., through its Los Angeles Agency office, was licensed to conduct certain banking activities in California, it was organized and chartered in Luxembourg. Thus, petitioner's argument has no merit.

Petitioner's failure to establish that BCCI, S.A., its IOMB, or its Los Angeles agency office was both "chartered and supervised under Federal or State law" forecloses these institutions from qualifying under subsection 165(l)(3)(D), without consideration of the additional requirement that the qualifying entity be a "similar institution." Nevertheless, assuming arguendo BCCI, S.A., its IOMB, or its Los Angeles agency office was both "chartered and supervised under Federal or State law", we consider whether it was also a "similar institution".

We interpret the term "similar institution" to mean an institution similar to those delineated pursuant to the provisions of subsections 165(l)(3)(A) to (C). The institutions described in those provisions were organized and supervised under Federal or State law, and/or insured customers' deposits under Federal or State law. But none of these factors apply to BCCI, S.A., its IOMB, or its Los Angeles agency office, other than the Los Angeles agency office's supervision by Federal and State authorities. Moreover, satisfaction of the "supervision" element alone does not

render the Los Angeles agency office a "qualified financial institution". Thus, we hold that the three entities involved herein were not similar institutions.

In sum, we hold that neither BCCI, S.A., its IOMB, nor its Los Angeles agency office is a "qualified financial institution" pursuant to section 165(l)(3)(D).[14] Accordingly, petitioner is not entitled to a casualty loss in 1991.

Issue 2. Bad Debt

Because petitioner is not entitled to a casualty loss, we must determine whether she is entitled to a bad debt deduction under section 166. Petitioner argues that her claimed loss should at least be treated as a 1991 nonbusiness bad debt. Respondent agrees that the claimed loss is properly treated as a nonbusiness bad debt, but contends that the loss was not worthless at the close of 1991.

A nonbusiness debt is a debt other than "a debt created or acquired * * * in connection with a trade or business of the taxpayer" or "a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business." Sec. 166(d)(2)(A)

---

[14] The above analysis makes it unnecessary to consider whether petitioner incurred a loss "as of the close of the taxable year" that "can reasonably be estimated", sec. 165(l)(1)(A), and whether such loss was "on account of the bankruptcy or insolvency of such institution", sec. 165(l)(1)(B).

and (B). Nonbusiness debts can only be deducted as short-term capital losses in the year in which they become wholly worthless. Sec. 166(d)(1)(A) and (B); Dustin v. Commissioner, 53 T.C. 491, 501 (1969), affd. 467 F.2d 47 (9th Cir. 1972); sec. 1.166-5(a)(2), Income Tax Regs. Worthlessness in a particular year is a question of fact that must be determined by "an examination of all the circumstances". Dallmeyer v. Commissioner, 14 T.C. 1282, 1291 (1950). Relevant considerations include circumstances such as the solvency of the debtor and efforts to collect the debt.

The year a debt becomes worthless is fixed by identifiable events that form the basis of reasonable grounds for abandoning any hope of recovery. Crown v. Commissioner, 77 T.C. 582, 598 (1981). Petitioner must establish sufficient objective facts from which worthlessness could be concluded; mere belief of worthlessness is insufficient. Fox v. Commissioner, 50 T.C. 813, 822-823 (1968), affd. per curiam 25 AFTR 2d 70-891, 70-1 USTC par. 9373 (9th Cir. 1970).

We agree with respondent that petitioner's claim against BCCI was not worthless in 1991. Petitioner had claims pending against BCCI in liquidation at the close of 1992.[15] Cf. Halliburton Co. v.

_____

[15] This case is similar to Sandquist v. Commissioner, T.C. Memo. 1978-281, where this Court found that the bank had assets
(continued...)

Commissioner, 93 T.C. 758 (1989), affd. 946 F.2d 395 (5th Cir. 1991) (taxpayer had expropriation losses in Iran; courts held that taxpayer had no reasonable prospect of recovering its losses at end of 1979). Acting through her attorney and return preparer, petitioner has continued to actively pursue her claims against BCCI. Because BCCI was still in liquidation at the close of 1991, the future of petitioner's claim was uncertain. Petitioner's claim had a potential value; thus, it was not worthless in 1991. See Dustin v. Commissioner, supra.

In fact, as recently as December 1996, the liquidator for BCCI, S.A. declared a dividend of 24.5 cents on the dollar in respect of all pending claims. In petitioner's case, this meant a $67,703.42 dividend in respect of her account No. 03000571.[16] Thus, we hold that petitioner's deposit had not become worthless as of

---

[15](...continued)
that, viewed as of the close of either year in which the taxpayer claimed the deduction, might have become available for the satisfaction of her claim. The Court thus denied the deduction for the years in question.

[16] The letter from the liquidator states that all depositors who made claims against the Isle of Man Depositors Compensation Scheme have been paid 75 percent of account balances, up to 20,000 pounds sterling. Petitioner calculated the amount of her deduction based upon having been paid 15,000 pounds sterling by the Isle of Man Depositors Compensation Scheme. This contributes further uncertainty as to the value of the debt in 1991.

December 31, 1991.  Accordingly, petitioner is not entitled to a bad debt deduction in 1991.

To reflect the foregoing,

<u>Decision will be entered for respondent</u>.