T.C. Memo. 2014-178

UNITED STATES TAX COURT

CHARLES T. BRUCE AND MARY A. BRUCE, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 29005-10.                              Filed September 2, 2014.

P-H desired to sell Ps' M stock in the ready market. P-H's
financial planners promoted to P-H a plan to cash out the value of the
stock and pay no Federal tax. P-H, a high-school-educated seafarer
with little tax knowledge, consulted his attorney/tax adviser, who in
turn advised P-H that the plan was legitimate. Pursuant to the plan,
P-H and G entered into two offsetting $5.5 million loans, one of
which was labeled a "Swap" and for which P-H claimed a basis of
$5.5 million. P-H contributed the Swap to a newly formed unitrust in
which he retained a remainder interest and the power to substitute for
the unitrust's corpus property of equal value. His two daughters each
had a 1% unitrust interest. P-H sold his remainder interest to two
other newly formed trusts (Ts), the beneficiary of each of which was
one of the daughters, in exchange for promissory notes totaling the
portion of the $5.5 million basis that P-H apportioned to the remainder
interest (approximately $5.4 million). P-H substituted the M stock for
the Swap in the belief that each property was of the same value. Ts
acquired the daughters' unitrust interests, the unitrust was terminated,
and the M stock was distributed to Ts. Ts transferred the M stock to

[*2] S, a general partnership that Ts formally owned and P-H controlled. S sold the M stock to a third party for cash, and Ps received the value of their M stock through Ts' payments on the promissory notes from the cash that the third party paid to purchase the M stock. Ps reported on their Federal income tax return that they realized no gain or loss on the sale of the remainder interest because the selling price equaled the basis. Ps did not report that the M stock was sold or that they realized any gain or loss as to that sale.

Held: The applicability of the three-year limitations period under I.R.C. sec. 6501(a) is not properly before the Court in that (1) Ps attempt inappropriately to raise this issue in their opening brief and (2) I.R.C. sec. 7491(a)(1) does not require that the Court hold that the limitations period bars assessment simply because the record establishes that a deficiency notice was issued after the three-year period and does not establish that an exception to the three-year period applies.

Held, further, Ps' gross income includes the full proceeds from the sale of the remainder interest in that P-H's basis in that interest was zero. Alternatively, Ps are considered to have sold the stock directly to the third party for Federal income tax purposes and must recognize their gain on that sale.

Held, further, I.R.C. sec. 162(a) does not allow Ps to deduct the legal and professional expenses related to the plan.

Held, further, Ps are not liable for the 40% accuracy-related penalty that R determined under I.R.C. sec. 6662(h) because P-H reasonably relied on the advice of his attorney.

R. Cody Mayo, Jr., for petitioners.

Marshall R. Jones, for respondent.

**[*3]**                 MEMORANDUM FINDINGS OF FACT AND OPINION

WHERRY, <u>Judge</u>:  Petitioners petitioned the Court to redetermine respondent's determination of an $819,041 deficiency in their Federal income tax for 2003 and a $327,616.40 accuracy-related penalty under section 6662(h) for a gross valuation misstatement.[1]  We decide the following issues:

1.  whether the applicability of the three-year limitations period under section 6501(a) is properly before the Court.  We hold it is not;

2.  whether petitioners underreported their income stemming from a plan (plan) involving the sale of their stock in Sea & Sea Marine, Inc. (Marine).  We hold they did;

3.  whether petitioners may deduct the legal and professional expenses that respondent disallowed.  We hold they may not;

4.  whether petitioners are liable for the 40% accuracy-related penalty that respondent determined under section 6662(h).  We hold they are not.

---

[1]Unless otherwise indicated, section references are to the applicable versions of the Internal Revenue Code of 1986, as amended for the year in issue (Code), Rule references are to the Tax Court Rules of Practice and Procedure, and dollar amounts are rounded to the nearest dollar.  While the deficiency notice states on one page that respondent determined that petitioners are liable for a 20% accuracy-related penalty under sec. 6662 for negligence, the notice elsewhere clarifies that respondent determined that the 40% percent accuracy-related penalty for gross valuation misstatement is applicable and that the 20% accuracy-related penalty for negligence is not.

[*4]                                        FINDINGS OF FACT[2]

I. Preliminaries

The parties submitted stipulated facts and exhibits, and we find the

stipulated facts accordingly.  We incorporate herein the stipulated facts and the

facts drawn from the exhibits.

Petitioners are husband and wife, and they have two daughters, Rebekah

Ruth Bruce (RRB) and Sarah Jane Bruce (SJB) (collectively, daughters).

---

[2]Each party filed an opening brief and a reply brief.  Petitioners' opening
brief, as supplemented (collectively, opening brief), does not comply with Rule
151(e)(3) with respect to proposed findings of fact.  Rule 151(e)(3) required that
the opening brief contain

> [p]roposed findings of fact * * * in the form of numbered statements,
> each of which shall be complete and shall consist of a concise
> statement of essential fact * * *.  In each such numbered statement,
> there shall be inserted references to the pages of the transcript or the
> exhibits or other sources relied upon to support the statement.

Petitioners' opening brief fails to set forth petitioners' proposed findings of fact in
numbered statements; instead, it contains a "STATEMENT OF FACTS" in
narrative form with footnote references throughout which reference portions of the
trial transcript but do not mention the stipulations or any of the exhibits.  In
addition, that brief in many instances fails to reference the transcript, exhibit, or
other source upon which petitioners rely to support their recitation of the facts.
While we have thoroughly reviewed the record to find the facts of this case,
petitioners, by their failure to follow our Rules, "have assumed the risk that we
have not considered the record in a light of their own illumination."  Monico v.
Commissioner, T.C. Memo. 1998-10, 75 T.C.M. (CCH) 1556 n.1 (1998).

**[*5]** Petitioners filed a joint Federal income tax return for 2003, and they resided at a Louisiana address when the petition underlying this case was filed.

Charles Bruce is an experienced, successful tugboat captain and fisherman. He has a high school education and regularly consults with and relies upon professionals, friends, and employees to advise and inform him before he makes his business decisions. He relied upon the advice of Attorneys Francis J. Lobrano and David J. Lukinovich to effect the plan (discussed infra pp. 10-11), receiving the latter's advice directly from him or through Mr. Lobrano. Mr. Bruce also relied heavily upon the advice of his longtime friend and loyal employee, Wade A. Rousse.

## II. Marine and Maritime Logistics

### A. Marine

Marine is a Louisiana corporation that was organized in 1991. Each petitioner owned one-half of Marine's stock from at least January 1, 2000, when Marine elected S corporation status for Federal income tax purposes, through early September 2003. An election was made to characterize Marine as an S corporation effective January 1, 2000, and petitioners treated Marine as an S corporation from January 1, 2000, through September 5, 2003. As further discussed infra p. 22, petitioners caused the Marine stock to be formally owned by a shareholder that

[*6] made Marine ineligible for status as an S corporation as of September 5, 2003, and Marine thereafter reported that it was taxable as a C corporation.

Marine was a small offshore water transportation/tugboat business. Marine owned a 214-foot offshore oilfield supply vessel named the M/V Sarah Jane Bruce (Sarah Jane). The Sarah Jane was Marine's principal asset (and its sole marine vessel) in 2003. Marine operated the Sarah Jane out of Port Fourchon, Louisiana.

Marine acquired the Sarah Jane on September 3, 2002, in a "like-kind exchange" for a boat of then-equal value which Mr. Bruce (through his business) had acquired for and used in his business since 1993. During 2003 the Sarah Jane could easily have been sold (and was sold in 2003 as discussed infra p. 24) for $5 million. Marine's basis in the Sarah Jane was zero as of January 1, 2003.

B. Maritime Logistics

Mr. Bruce coowned a second business referred to as "Maritime Logistics". Maritime Logistics' other coowners were Mr. Rousse, Joey Adams, and one or more other individuals whose identity is not relevant to our analysis. Mr. Adams was a boat owner, and he owned (through his company) one or more marine vessels.

Maritime Logistics was a maritime brokerage business; i.e., essentially a business in which one or more boat owners worked together to obtain contractual

[*7] work for their boats. Maritime Logistics obtained contract work for Marine and for a company owned by Mr. Adams (and possibly for one or more other companies). Maritime Logistics' manager and primary worker was Mr. Rousse.

III. Mr. Rousse

Mr. Rousse grew up in Mr. Bruce's neighborhood. Mr. Rousse as a teenager mowed the grass at Mr. Bruce's home, and they had a special business and familylike personal relationship. Their personal relationship originally stemmed from Mr. Bruce's friendship with Mr. Rousse's father, which developed from the father's and Mr. Bruce's attending school together and from their working together. With Mr. Bruce's encouragement, Mr. Rousse later received a college degree in business administration and then went to work for Mr. Bruce full time. Mr. Rousse worked for Mr. Bruce for approximately 20 years, and Mr. Rousse spearheaded the growth of Mr. Bruce's businesses during that time.

Mr. Bruce always encouraged Mr. Rousse to further his education, and Mr. Rousse earned an M.B.A. from the University of New Orleans while employed by Mr. Bruce. Mr. Rousse ultimately stopped working for Mr. Bruce to pursue a master's degree and a Ph.D in economics from the University of Illinois at Chicago, Illinois. After earning those degrees during or about 2007, Mr. Rousse

[*8] went to work for the Federal Reserve Bank of Chicago as an economist specializing in policy research and economic outreach.

## IV. W&T

W&T Offshore, Inc. (W&T), is a publicly traded oil and gas exploration company operating primarily in the Gulf of Mexico. In or about March 2003 W&T and Maritime Logistics were negotiating some long-term contracts which would allow Marine to build one or more supply vessels to service W&T.

## V. March 2003 Borrowings

### A. March 19, 2003

On March 19, 2003, Marine borrowed $2,522,223 from American Horizons Bank (AHB). This loan was secured by Marine's deposits with AHB.

### B. March 20, 2003

On March 20, 2003, Mr. Bruce borrowed $2,303,967 from Marine. Mr. Bruce secured the repayment of this loan with stock that he owned in FBT Bancorp, Inc. (FBT), a Delaware corporation.

## VI. Mr. Doverspike

Jack Doverspike is a Larose, Louisiana-based insurance agent and financial planner with whom Mr. Bruce had done business (e.g., made investments and purchased life insurance) for several years. In or about 1998 Mr. Doverspike

[*9] began talking to Mr. Bruce about his and his wife's estate plans and a possible "estate freeze" to minimize estate tax, and Mr. Doverspike did some estate work for Mr. Bruce in or about 2001.

Soon after W&T and Maritime Logistics began negotiating the long-term contracts, Mr. Doverspike invited Mr. Bruce to meet with Mr. Doverspike and two financial planners, John Ohle and Scott Deichmann,[3] to discuss Mr. Bruce's financial and estate plans further. As of that time Mr. Bruce was planning to retire and to move permanently to Baton Rouge, Louisiana, where one of his daughters and her children lived, and he desired to sell Marine (or the Sarah Jane) as part of those plans. In addition, Mr. Rousse was planning to move to Chicago to pursue

---

[3]John B. Ohle III was convicted in 2010 of conspiracy to defraud the Internal Revenue Service and of attempted tax evasion. See United States v. Ohle, 441 Fed. Appx. 798, 799 (2d Cir. 2011). We take judicial notice from documents filed in that case that this conviction stemmed from his selling a shelter in 2001 and 2002 devised by Paul Daugerdas as a partner of the now defunct law firm of Jenkins & Gilchrist that claimed millions of dollars in phony tax losses. See Fed. R. Evid. 201; Mangiafico v. Blumenthal, 471 F.3d 391, 398 (2d Cir. 2006); Petzoldt v. Commissioner, 92 T.C. 661, 674 (1989). Mr. Daugerdas was recently sentenced to 15 years' confinement as the result of his tax evasion and conspiracy conviction related to tax shelter transactions commonly referred to as "short sales", "short options strategy", "Swaps" and "HOMER", to generate fraudulent tax savings. See United States v. Daugerdas, Dkt. No. 09-cr-00581 (S.D.N.Y. June 27, 2014). We also take judicial notice that Scott D. Deichmann was a conspirator and a coemployee of John B. Ohle III, and we note that David Lukinovich and John B. Ohle III were business acquaintances although Mr. Lukinovich was not directly involved in these tax shelters. See also Ducote Jax Holdings LLC v. Bradley, 335 Fed. Appx. 392, 394, 396, 402 (5th Cir. 2009); Ducote Jax Holdings, L.L.C. v. Bradley, C.A. No. 04-1943, 2007 WL 2008505 (E.D. La. July 5, 2007).

[*10] his doctoral degree.  Mr. Bruce's most valuable asset was petitioners' stock in Marine.  Mr. Bruce aspired to maximize the funds petitioners would retain upon a sale of that stock so that they could live comfortably in his retirement and he could give some of the sale proceeds to Mr. Rousse in recognition of his employment with, and his loyalty to, Mr. Bruce.

Mr. Bruce spoke to Mr. Rousse about Mr. Doverspike's invitation, and Mr. Rousse agreed to accompany Mr. Bruce to the meeting in Larose, Louisiana.  They met with Mr. Doverspike and the financial planners shortly thereafter during or before early 2003.  The financial planners were promoting the plan, which Mr. Ohle (and possibly Mr. Deichmann) devised to provide estate and/or income tax benefits.

The framework of the plan apparently required that Mr. Bruce enter into two offsetting $5.5 million loans, one of which was labeled a "Swap" and for which Mr. Bruce would claim a basis of $5.5 million.[4]  Mr. Bruce would then contribute the Swap to a newly formed unitrust in which each of the daughters had a 1% interest and he retained a remainder interest and the power to substitute for the

[4]Documents in the record use the term "Swap" in reference to one of the two loans, and the parties do likewise.  As discussed infra pp. 40-42, the "Swap" is not a "swap" as that term is used in the financial market, but it is at best a loan agreement.  We follow the parties' lead and refer to the "Swap" as such to avoid confusion.  We neither intend to suggest nor find that the "Swap" was a "swap" within the financial market vernacular.

[*11] unitrust's corpus property of equal value. The next step would be for Mr. Bruce to sell his remainder interest to two other newly formed trusts, the sole beneficiary of each of which was one of the daughters, in exchange for promissory notes totaling the portion of the $5.5 million basis that Mr. Bruce apportioned to the remainder interest. As to the next step Mr. Bruce would substitute the Marine stock for the unitrust's corpus (i.e., the Swap), on the basis that the properties were of equal value. The two trusts would acquire the daughters' unitrust interests. The unitrust would then be terminated and the Marine stock distributed to the two trusts. The two trusts would transfer the Marine stock to a partnership that the trusts owned and Mr. Bruce controlled. The partnership would then sell the Marine stock in the ready market to a third party for cash, and petitioners would receive the value of their Marine stock through the two trusts' payments, on the promissory notes, from the cash that the third party paid to purchase the Marine stock. Mr. Bruce knew that, without the plan, significant Federal income tax would be imposed on petitioners' direct sale of the Marine stock, or on a sale of the Sarah Jane, and the financial planners generally advised Mr. Bruce that the plan would allow petitioners to cash out the value of their stock without paying any Federal tax on the cashout.

[*12] Mr. Lobrano, then a sole practitioner, was Mr. Bruce's longtime attorney/tax adviser, having represented him in the purchase and sale of various watercraft.[5] Mr. Bruce (or Mr. Rousse on behalf of Mr. Bruce) asked Mr. Lobrano to meet with the financial planners and then to give Mr. Bruce an independent, more learned opinion on the plan. Mr. Lobrano later met with Messrs. Bruce, Rousse, Ohle, and Deichmann, and Mr. Lobrano listened to their promotion spiel. Mr. Lobrano believed the plan to be valid as he equated it to "a derivative of a sale to a defective grantor trust strategy, which has been around". He felt uncomfortable, however, opining that the plan was valid simply on the basis of his own belief.

Mr. Doverspike suggested that Mr. Bruce retain Mr. Lukinovich, another graduate from the New York University School of Law with an LL.M. in tax, to opine on the validity of the plan. Mr. Lukinovich practiced in southern Louisiana, and the Louisiana Board of Legal Specialization recognized him as a certified tax attorney and as a certified estate planning and administration specialist. Mr. Lobrano advised Mr. Bruce to follow Mr. Doverspike's suggestion. Mr. Lobrano

---

[5]Mr. Lobrano was a local attorney in Belle Chasse, Louisiana, and he had impeccable tax credentials in the rural suburban Lafourche community in which he practiced law, part of which included Mr. Bruce's community of Cut Off, Louisiana, southwest of New Orleans. Mr. Lobrano graduated from Tulane University, first with a bachelor of science degree in management and later with a juris doctor degree, and he earned a master's degree (LL.M. in taxation) from New York University School of Law. He was certified by Louisiana as a tax specialist and enjoyed an AV rating in Martindale Hubbell, of which we take judicial notice.

[*13] knew that Messrs. Lukinovich and Doverspike had some common clients and thus an ongoing business relationship with each other. Mr. Lobrano also believed it likely that Messrs. Ohle, Deichmann, and Lukinovich had presented similar plans to their clients resulting in an ongoing business relationship as to the plans.

Mr. Lukinovich (at the invitation of Mr. Doverspike or Mr. Lobrano) met with Messrs. Lobrano, Doverspike, Bruce, and Rousse (and possibly others). Ultimately, Mr. Lukinovich, working with his future attorney James G. Dalferes, issued 58-page and 49-page legal opinion letters to Mr. Bruce and to Mr. Rousse (as trustee of two trusts (Daughters' Trusts) to be formed for the daughters as part of the plan), respectively. The opinion letter issued to Mr. Bruce, dated April 13, 2004, stated that Mr. Bruce had "requested our opinions regarding certain federal income tax consequences" as to the plan and concluded in relevant part that Mr. Bruce's sale to the Daughters' Trusts of his remainder interest in a unitrust named CTB 2003 Trust No. 1 (CTB), discussed infra pp. 17-18, was "more likely than not" a taxable event for which he was required to report gain equal to the sale price less his basis in the interest. While the letter did not specifically state the amount of Mr. Bruce's basis in the interest or the amount of any such gain that Mr. Bruce was required to report, it stated, as a fact, that Mr. Bruce had "purchased a swap

[*14] contract" for $5.5 million and concluded as to Mr. Bruce's basis in the remainder interest that

> it is more likely than not, in our opinion, that your basis in your retained remainder interest in CTB Trust No. 1 is equal to your basis in the Swap Contract contributed to CTB Trust No. 1, less the amount of basis allocable to the lead trust unitrust interests in such trust, and that the Valuation Rules set forth in Section II of this analysis should apply in allocating the basis between your retained remainder interest and the lead unitrust interests.

The opinion letter did not state that Mr. Bruce had to report any other income as to the plan. The opinion letter issued to Mr. Rousse, dated April 14, 2004, stated that Mr. Rousse had "requested our opinions regarding certain federal income tax consequences" as to the plan and generally concluded that the Daughters' Trusts did not have to report any income on account of the plan. Neither opinion letter addressed whether petitioners or Sareb Investments, LLC (Sareb),[6] a passive entity that was formally established incident to the plan and the sale of petitioners' Marine stock, was in substance the seller of that stock.

VII. Consummation of the Plan

A. Background

After consulting with his professional advisers and in part on the basis of their recommendations and advice, Mr. Bruce decided to consummate the plan, and

---

[6]The record sometimes refers to Sareb as Sarab. We use the spelling used by the parties.

[*15] he was generally charged a set billing price to do so.  The plan involved multiple transactions, and Mr. Bruce lacked any understanding of these transactions, including their purpose or significance, or the risks or benefits involved.  Messrs. Lobrano and Lukinovich, sometimes separately and other times collaboratively, drafted the necessary documents to carry out the transactions.

Transactions effected incident to the consummation of the plan were as follows.

B.  May 23, 2003

Many transactions were effected on May 23, 2003.

Mr. Bruce formally issued a promissory note (Gamma note) of $5.5 million to Gamma Trading Partners Limited Liability Co. (Gamma).  The Gamma note provided that, "FOR VALUE RECEIVED" (supposedly, the $5.5 million that was referenced in the Gamma note), Mr. Bruce would pay Gamma $5.5 million, plus interest of 2.9% per annum, on December 31, 2003 (or, if he wanted, an earlier date after expiration of any transaction evidenced by a confirmation under the International Swap Dealers Association, Inc.'s Master Agreement of May 23, 2003, between Mr. Bruce and Gamma (Swap)).  The Gamma note further provided that the $5.5 million which Mr. Bruce was referenced to receive under the Gamma

[*16] note had to be used solely to effect the Swap.[7] The Gamma note required Mr. Bruce to pay Gamma an "Initial Loan Fee" and a "Quarterly Loan Fee" in addition to the stated interest. The former fee equaled 2% of the $5.5 million ($110,000) and was payable on May 23, 2003. The latter fee equaled 0.1% of the $5.5 million ($5,500) and was payable for each calendar quarter (excluding any calendar quarter before July 2003) during which the Gamma note was not paid in full.

Samyak C. Veera[8] (as Gamma's manager) and Mr. Bruce formally executed the Swap master agreement (a boilerplate document typically associated with swap contracts) and a related schedule and confirmation letter. This Swap master agreement provided that Mr. Bruce would "pay" Gamma $5.5 million on May 23,

---

[7]The record does not establish (and we decline to find) that Mr. Bruce actually received the $5.5 million referenced in the Gamma note. To the contrary, it appears that he did not. When the Gamma note is viewed in tandem with the Swap, it seems most likely this was a "paper transaction" whereby the $5.5 million that Mr. Bruce was entitled to receive from Gamma under the Gamma note was simply offset against the $5.5 million that Mr. Bruce was required to pay Gamma under the Swap.

[8]We take judicial notice of an October 23, 2013, U.S. Department of Justice press release announcing that an individual named Samyak Veera had recently been charged with conspiring through a complex, multi-million-dollar tax fraud scheme to cause more than $200 million in losses to the United States between at least 2003 and 2011, as well as tax evasion. See Paschall v. Commissioner, 137 T.C. 8, 11 n.7 (2011).

[*17] 2003, and that Gamma would "pay" Mr. Bruce $5,530,152 on July 31, 2003.[9]

The $30,152 difference between these two payments corresponds to the application of a 2.9% annual interest rate to the period from May 23 through July 31, 2003, and completely offsets the interest on the Gamma note that Mr. Bruce was required to pay to Gamma for the period from May 23 through July 31, 2003.

Mr. Bruce formally entered into a security agreement with Gamma pledging and granting a security interest in the Swap and certain other incidental collateral to secure his obligations under the Gamma note.

Mr. Bruce, as settlor and with South Dakota Trust Co., LLC (SDTC), as trustee, formally established CTB under the laws of South Dakota. He retained a remainder interest in CTB and named his daughters as unitrust beneficiaries who would receive annual distributions generally equal to 1% of the net fair market value of CTB's assets.[10] Incident thereto, Mr. Bruce formally assigned his interest in the Swap to CTB, CTB formally assumed Mr. Bruce's obligations under the Swap, and CTB formally agreed not to incur any debt in excess of $20,000 until

---

[9]Again, the record does not establish (and we decline to find) that Mr. Bruce actually paid the $5.5 million referenced in the Swap.

[10]Mr. Lukinovich's firm prepared CTB's trust instrument (and all of the documents related to the funding of CTB), and Mr. Lukinovich (or possibly Mr. Ohle) selected SDTC to serve as CTB's trustee.

[*18] the Gamma note was repaid.[11]  CTB's trust agreement allowed Mr. Bruce during his lifetime to substitute for CTB's corpus "property of an equivalent value", and the plan's promoters included this provision intending to characterize CTB as a grantor trust for Federal income tax purposes as long as Mr. Bruce lived and held this power of substitution.  The trust instrument further stated that the daughters' rights to receive the annual distributions would terminate two years later on May 23, 2005.[12]  Upon termination, Mr. Bruce or his assignee (or Mr. Bruce's estate if he died without designating an assignee) would receive all of CTB's assets remaining for distribution.

C. June 1, 2003

On June 1, 2003, petitioners, as settlors, and Mr. Rousse, as trustee, formally established the Daughters' Trusts under the names Sarah Jane Bruce Trust (SJB Trust) and Rebekah Ruth Bruce Trust (RRB Trust).  The original corpus of each of the Daughters' Trusts was $50.

---

[11]Mr. Bruce's formal interest and obligations under the Swap, absent default or early termination, were primarily the obligation to pay $5.5 million on May 23, 2003, and the right to the return of the $5.5 million approximately 2 months later with an additional amount equal to interest accumulating at 2.9% per annum.

[12]Mr. Bruce was expected to be alive on May 23, 2005.

**[\*19]** D. <u>July 1, 2003</u>

On July 1, 2003, petitioners formally transferred 30,000 shares of AHB stock (worth approximately $300,000) and $60,000 to each of the Daughters' Trusts.

E. <u>July 31, 2003</u>

On July 31, 2003, Mr. Bruce and the Daughters' Trusts formally entered into a transaction in which Mr. Bruce sold his remainder interest in CTB, whose only asset at that time was the Swap, to the Daughters' Trusts for $5,419,549. The $5,419,549 was formally paid through each of the Daughters' Trusts' issuance of a promissory note payable to Mr. Bruce in the amount of $2,709,774.48. Each note required that simple interest at the rate of 2.55% per annum be paid annually on the anniversary date of the note and that the principal with accrued interest be paid on or before July 30, 2012.

By the end of July 31, 2003, Gamma had not paid, as to the Swap, the $5,530,152 that was then due. The record does not explain why Gamma on July 31, 2003, did not pay the $5,530,152 that was then due, or whether Mr. Bruce took any action at that time to enforce this payment.

[*20] F. August 13, 2003

On August 13, 2003, Chaffe & Associates, Inc., Investment Bankers (C&A), issued a letter appraising Marine's equity at a fair market value of $5,822,175 as of January 1, 2003. C&A's appraisal was solely for the purpose of selling all of the Marine stock to a grantor retained annuity trust. C&A noted in its appraisal that Marine owned the Sarah Jane, which Marine represented to C&A (and C&A presumed) had a market value of $5 million based in part on an appraisal of the Sarah Jane as of March 12, 2001, by Rivers and Gulf Marine Surveyors, Inc. C&A also noted that Mr. Lobrano had requested that C&A perform its appraisal on an "asset approach only" and "disregard any corporate taxes that would be due should the Company [Marine] sell the vessel prior to the expiration on January 1, 2010 of the built in corporate tax."

G. August 20, 2003

On August 20, 2003, Mr. Bruce formally exercised his power of substitution and formally transferred the Marine stock to CTB in exchange for the Swap.[13]

---

[13]The "Substitution Agreement" underlying the August 20, 2003, transfer refers to a stock certificate dated January 1, 2003, and "a Certificate in the form attached hereto as Exhibit B" but does not include a copy of either of those certificates. While petitioners concede that Ms. Bruce owned one-half of the Marine stock at the beginning of 2003 and the record establishes that she continued to own that portion of the stock through September 5, 2003, we find no credible evidence in the record that supports a finding that Mr. Bruce, in his name alone,

(continued...)

[*21] Later that day, SDTC informed Mr. Bruce that it intended to resign as CTB's trustee within the next few days, stating that "as sole trustee, we did not contemplate nor do we feel comfortable administering a non-directed trust that holds closely held assets". Also on August 20, 2003, the July 31, 2003, payment date for the Swap was formally extended to August 29, 2003, with a corresponding increase in the amount payable equal to 2.9% annual interest prorated for the period of extension.

### H. August 21, 2003

On August 21, 2003, SJB formally sold her CTB interest to RRB Trust, and RRB formally sold her CTB interest to SJB Trust. The sale price for each interest was $55,385.

### I. August 29, 2003

Sareb was formally established on August 29, 2003, to serve as a holding company to which all of the Marine stock would be transferred. Each of the Daughters' Trusts formally owned one-half of Sareb, and Mr. Rousse was Sareb's

---

[13](...continued)
could legitimately transfer all of the Marine stock in this transaction. Nor do we find that the Marine stock, which had just been appraised at a fair market value of approximately $5.8 million, and the Swap, which we conclude had no value, were "property of an equivalent value".

[*22] designated manager.  For 2003 Sareb reported its income and expenses for Federal income tax purposes as if it were a domestic general partnership.

### J.  August 31, 2003

On or about August 31, 2003, Mr. Bruce, Mr. Rousse (as trustee for the Daughters' Trusts), and SDTC (as the trustee of CTB) formally executed a document through which Messrs. Bruce and Rousse consented to CTB's termination on August 31, 2003.  At its termination, CTB formally owned all of the Marine stock, and all of that stock was formally distributed equally to the Daughters' Trusts in accordance with the terms of the CTB trust agreement.

### K.  September 5, 2003

On September 5, 2003, the Daughters' Trusts formally transferred all of the Marine stock to Sareb as a capital contribution.  Mr. Lobrano believed that this transfer caused a termination of Marine's status as an S corporation because Sareb's shareholder was then a limited liability company, and he coordinated the closing of Marine's books to reflect that it was no longer an S corporation.

### L.  September 9, 2003

Before September 9, 2003, W&T had abandoned its plan for the long-term contracts with Maritime Logistics, Mr. Doverspike had contacted Mr. Rousse to inform him that he knew of a group of buyers from New York who were interested

[*23] in purchasing Marine, and Mr. Rousse had met with the investors to discuss a possible sale of Marine. On September 9, 2003, Sareb formally sold the Marine stock to Sea & Sky Mirror Images, L.L.C. (Mirror), a Delaware limited liability company, for $4,721,627 plus any business receivable (ultimately $321,160) that Marine collected within 90 days after the closing which Marine reflected in its books as of the closing. A law firm, Morris, Manning & Martin, LLP (MMM), was the escrow agent for the sale, and $4,721,627 was delivered to MMM on the day of the sale. MMM deposited the $4,721,627 into its escrow account for the Marine stock sale (Marine stock sale escrow account).

Shortly after the sale, Mirror informed Mr. Rousse that it wanted to sell the Sarah Jane. Mr. Rousse knew of various local individuals (many of whom during mealtime conversed daily with each other (and with Messrs. Bruce and Rousse)) who were interested in purchasing the Sarah Jane, and he met with a few of these individuals.

M. September 11, 2003

Wiley Falgout was Mr. Bruce's friend from high school, and Mr. Falgout (among others) had asked Mr. Bruce, as early as 2000, if he wanted to sell the Sarah Jane for $5 million. As of September 11, 2003, Mr. Falgout wanted his two children to buy the Sarah Jane through their limited liability company, Minnie

[*24] Falgout, L.L.C., a marine supply boat business that Mr. Falgout operated. Messrs. Bruce and Rousse desired that Mr. Falgout purchase the Sarah Jane in lieu of any other prospective purchaser.

On September 11, 2003, Minnie Falgout, L.L.C., and Mirror executed a purchase agreement under which they agreed that Minnie Falgout, L.L.C., would buy the Sarah Jane for $5 million with the closing of the sale to occur on or before October 8, 2003. Mr. Falgout negotiated this agreement directly with Mr. Bruce while also speaking to Mr. Rousse about the operational aspects of the Sarah Jane. Mr. Falgout believed at the time that Mr. Bruce (or a company he controlled) owned the Sarah Jane.

N.  September 16, 2003

On September 16, 2003, Minnie Falgout, L.L.C., paid $5 million to Marine (through MMM, as escrow agent) to purchase the Sarah Jane. MMM placed those funds into an escrow account for that sale (Sarah Jane sale escrow account). Later that day, MMM wired $2,348,690 from the Sarah Jane sale escrow account to AHB in final payment of Marine's $2,522,223 promissory note to AHB, leaving a balance in the Sarah Jane sale escrow account of $2,651,310. The $2,651,310 and an additional $390,886 ($3,042,196 in total) were transferred on September 19, 2003, to the account of an entity whose identity appears to be "slto Trading

[*25] Partners". Later on September 19, 2003, Marine transferred another $2,307,804 to that entity's account bringing the balance in the account to $5,350,000.

Also on September 16, 2003, MMM wired $2,372,938 to Sareb from the escrow account for the Marine stock sale, leaving a balance in the escrow account of $2,348,690 ($4,721,627 – $2,372,938).[14] The $2,348,690 balance was transferred later that day to Marine. The amounts owed by the Daughters' Trusts under the July 31, 2003, promissory notes were reduced by $2,372,938 on account of the transfers, and Mr. Bruce's $2,303,967 promissory note to Marine was recorded as paid in full.

### O. September 23, 2003

Sareb purchased an 18-month certificate of deposit in the amount of $1.8 million on September 23, 2003. The certificate of deposit accrued interest at 2.16% per annum and had a maturity date of March 23, 2005.

### P. September 30, 2003

On September 30, 2003, the Daughters' Trusts (in equal proportions) transferred to Mr. Bruce stock in AHB valued at $300,000. Petitioners accounted for this transfer as payments on the July 31, 2003, promissory notes.

---

[14]The $1 discrepancy is a result of rounding.

[*26] Q. October 8 and 9, 2003

On October 8, 2003, a $400,000 check, drawn on Sareb's checking account, was deposited into petitioners' bank account. The check was paid one day later. Petitioners accounted for the $400,000 deposit as payments on the July 31, 2003, promissory notes.

R. November 13, 2003

On November 13, 2003, Mr. Rousse wrote Mr. Bruce a $165,000 check drawn on Sareb's checking account. The check, which was designated "Loan Repayment - trusts", was paid on November 20, 2003. Petitioners accounted for this transfer as payments on the July 31, 2003, promissory notes.

S. 2005

During at least 2005 Sareb had a checking account over which Mr. Bruce had signature authority although he was neither a manager nor an owner of Sareb. On March 28, 2005, Sareb deposited $1,858,214 into that account, which deposit represented the accrued balance of the certificate of deposit purchased September 23, 2003. Between April 12 and October 16, 2005, Mr. Bruce authorized and/or received $1,850,000 from that account.

[*27] VIII.  Cost of Plan

Mr. Bruce (individually and/or through Marine) paid at least $200,000 to consummate the plan.  Of those payments, at least $181,317 was for professional fees (including at least $155,000 to Mr. Lukinovich and/or Mr. Ohle, in part for the opinion letters, and at least $25,000 to Mr. Lobrano).  The balance, up to as much as $25,000, was for incidental costs.  The fees which Mr. Bruce paid were generally set before the consummation of the plan began.

IX.  Petitioners' 2003 Tax Return and Marine's 2003 Tax Returns

A.  Petitioners' Return

Petitioners reported on their 2003 tax return that they purchased "CTB Trust #1" on May 23, 2003, for $5,419,549, and that they sold that asset on July 31, 2003, for the same amount.[15]  Petitioners' 2003 return was prepared by John M. Estess, an owner of a local certified public accounting firm on the basis of information given to him by either Mr. Bruce or Mr. Lobrano.

---

[15]Petitioners do not specifically explain how they arrived at the $5,419,549 that they reported as their basis in CTB.  In that they assert that Mr. Bruce paid $5.5 million for the Swap, we infer that the $5,419,549 is the portion of the $5.5 million that they believed was attributable to the remainder interest.

[*28] B. Marine's Returns

1. Form 1120S

Marine filed a 2003 Form 1120S, U.S. Income Tax Return for an S Corporation, which was prepared by Mr. Estess, on June 24, 2004. The 2003 Form 1120S was prepared as a "short-year return", by virtue of Mr. Lobrano's believed termination during the year of Marine's status as an S corporation, but it did not indicate either that it was for a "short year" or what portion of 2003 it covered (although it reported that it was a "Final return"). The 2003 Form 1120S reported Marine's operations through the date on which it ceased to be an S corporation and reported that its only shareholders during the short year were petitioners, each owning one-half of its stock throughout the short year. Marine also reported on the 2003 Form 1120S, inter alia, that it was entitled to deduct $86,485 of legal and professional fees.

2. Form 1120

On or about September 15, 2004, Marine filed a Form 1120, U.S. Corporation Income Tax Return, for the remainder of 2003. This return reported Marine's operations for 2003 following the believed termination of its S status, but did not specifically state that it was a "short-year return" or the portion of 2003 that it covered.

[*29] Marine reported on the 2003 Form 1120, among other things, that it incurred a $4.75 million ordinary loss from "DKK/USD BINA" that it acquired for $4.75 million on September 15, 2003, and sold for nothing on September 16, 2003; and that it incurred a $600,000 short-term capital loss from an "INTEREST RATE SWAP" that it acquired for $600,000 on September 15, 2004 (sic), and sold for nothing on September 16, 2004 (sic).  Marine also reported on the 2003 Form 1120 that on September 16, 2003, it sold a building for $2,651,310, which it had acquired in May 1991; that it realized a $2,478,536 gain on the sale; that $1,882,612 and $595,924 of the gain were categorized as ordinary income and long-term capital gain, respectively; and that it was entitled to completely offset the $1,882,612 and the $595,924 by the ordinary loss from "DKK/USD BINA" and by the capital loss from the "INTEREST RATE SWAP", respectively.  Marine did not report on the 2003 Form 1120 that it sold the Sarah Jane during that year.

X.  Deficiency Notice

    A.  Overview

    Respondent issued a deficiency notice to petitioners on September 27, 2010. In the notice, respondent reflected his determinations as to (1) legal and professional fees, (2) capital gains income, (3) itemized deductions, and (4) the

[*30] application of the 40% accuracy-related penalty under section 6662(h) for a gross valuation misstatement.

## B. Legal and Professional Fees

Respondent determined that Marine was not entitled to deduct $52,450 of legal and professional fees attributable to the plan (the $52,450 was included in the $86,485 mentioned above). The notice stated that petitioners failed to show that the "payments were paid or incurred for the purposes designated, or that such payments otherwise met the requirements for deduction under the Internal Revenue Code".

## C. Capital Gains Income

Respondent determined that petitioners failed to recognize $5,266,724 in capital gains income. The notice stated:

> 1. You have not established that (i) the purported transfers of your Sea & Sea Marine, Inc. stock to the CTB Trust, and then to the Sarah Jane Bruce Trust and the Rebekah Ruth Bruce Trust and then to Sareb Investments, (ii) the purported sale of the Sea & Sea Marine stock to Sea & Sky Mirror Images LLC, and (iii) the transactions resulting in a loss claimed by Sea & Sea Marine from "DKK/USD BINA," (all of which, including all activities and contractual arrangements associated therewith, are hereinafter referred to as the Transaction) had any economic substance, were part of an activity entered into for profit, were supported by a bona fide business purpose, were not entered into for a tax avoidance purpose, were not a sham, or should be recognized for federal tax purposes.

[*31] 2. The substance of the transactions involving purported transfers of your Sea & Sea Marine, Inc. stock to the CTB Trust, and then to the Sarah Jane Bruce Trust and the Rebekah Ruth Bruce Trust and then to Sareb Investments, the purported sale of the Sea & Sea Marine stock to Sea & Sky Mirror Images LLC, and the transactions resulting in a loss claimed by Sea & Sea Marine, Inc. from "DKK/USD BINA," is not consistent with the form of such transactions. It is determined that the substance of the transaction was a sale of your stock in Sea & Sea Marine, Inc., for $5,419,549. Alternatively, it is determined that the substance of the transaction was a sale of assets by Sea & Sea Marine, Inc. while it was an S corporation, and a distribution of the sale proceeds along with all of its remaining assets to you in a complete liquidation of your interests in Sea & Sea Marine, Inc.[16]

D. Itemized Deductions

Respondent determined that petitioners could not deduct $28,783 of itemized deductions. The notice determined that respondent's adjustments to the legal and professional fees and to the capital gains income computationally increased petitioners' adjusted gross income beyond the threshold amount, thus resulting in the $28,783 concomitant automatic computational adjustment.

---

[16]While the notice of deficiency states that petitioners are considered to have sold the Marine stock for $5,419,549, it does not explain the manner in which that then turns into $5,266,724 of unreported capital gains income. Petitioners reported on their 2003 return that they realized $31,846 in capital losses unrelated to the plan, and respondent did not disallow any of the deduction for those losses. We infer that respondent determined that petitioners' applicable basis in the Marine stock was $120,979 (($5,419,549 – $120,979) – $31,846 = $5,266,724), and we find accordingly.

**[*32]** E. Accuracy-Related Penalty

Respondent determined that petitioners were liable for a 40% accuracy-related penalty under section 6662(h) for a gross valuation misstatement. The notice determined that this penalty applied to all of the three adjustments just discussed.

OPINION

I. Burden of Proof

The Commissioner's determinations in a deficiency notice are generally presumed correct, and taxpayers generally bear the burden of proving those determinations wrong. See Rule 142(a)(1); Welch v. Helvering, 290 U.S. 111, 115 (1933). Section 7491(a)(1) generally provides an exception to these rules in that section 7491(a)(1) shifts the burden of proof to the Commissioner as to any factual issue relevant to a taxpayer's liability for tax if the taxpayer meets certain conditions.[17] While the parties dispute whether section 7491(a)(1) applies here, we need not and do not decide that dispute because we render our decision on the basis of a preponderance of the evidence. See Estate of Bongard v. Commissioner, 124 T.C. 95, 111 (2005); see also Esgar Corp. v. Commissioner, 744 F.3d 648, 654-655

---

[17]Sec. 7491(a)(1) generally provides that "[i]f, in any court proceeding, a taxpayer introduces credible evidence with respect to any factual issue relevant to ascertaining the liability of the taxpayer for any tax imposed by subtitle A or B, the Secretary shall have the burden of proof with respect to such issue."

**[\*33]** (10th Cir. 2014), aff'g T.C. Memo. 2012-35 and Tempel v. Commissioner, 136 T.C. 341 (2011).

## II. Limitations Period

Petitioners' opening brief states that "petitioners now for the first time raise the statute of limitations as a bar to the assessment" and acknowledges that "This argument is problematic since this issue was not raised in the pleadings". Petitioners conclude that the three-year limitations period of section 6501(a) bars assessment because the record establishes that the deficiency notice was issued more than three years after their 2003 return was filed and fails to establish an exception to this three-year rule.[18]

Petitioners recognize that judicial jurisprudence holds that the applicability of the limitations period is not properly before the Court where the taxpayer failed to plead that matter in the petition. Petitioners assert that this jurisprudence is limited to situations where either the Court had entered a decision in the case before the issue of the limitations period was raised or the record otherwise showed that the deficiency notice was timely. Petitioners also contend that, even if the limitations period is not mentioned in the pleadings, section 7491(a)(1) in its own right requires the Court to hold that the three-year limitations period bars

_____

[18]Sec. 6501(a) and (b)(1) generally provides that tax must be assessed as to a return within three years of the later of its filing or its due date.

**[\*34]** assessment whenever the record establishes that a deficiency notice was issued after the three-year period and fails to establish that an exception to the three-year rule applies. As to this latter argument, petitioners claim that Congress, by enacting section 7491(a)(1), legislatively did away with the Court's requirement in Rule 39 that a taxpayer plead that the limitations period has expired in order to properly place that issue before the Court.

We disagree with petitioners' conclusion that the applicability of the limitations period is properly before the Court. The applicability of the limitations period is not a jurisdictional requirement that must be met for the Court to decide this case. The period of limitations is a rule of law that, unlike a jurisdictional requirement, may be waived if it is not pleaded properly. See Genesis Oil & Gas, Ltd. v. Commissioner, 93 T.C. 562, 564-565 (1989). Our Rules require that a taxpayer specifically allege as an affirmative defense in the petition that the limitations period has run in order to properly raise the applicability of the limitations period as an issue. See Rule 39; Woods v. Commissioner, 92 T.C. 776, 779 (1989). Petitioners acknowledge that they did not make such an allegation in the petition. We accordingly conclude that petitioners have waived any dispute

**[\*35]** that they now have as to the applicability of the three-year limitations period by not timely raising the issue.[19]

While we may sometimes exercise our discretion to consider an issue that was not timely raised, we generally do not exercise that discretion where a party raises the issue for the first time on brief and our consideration of the issue would unfairly prejudice the opposing party. See Chapman Glen Ltd. v. Commissioner, 140 T.C. 294, 349 (2013). Respondent asserts that petitioners validly executed consents extending the limitations period to a date after the date the deficiency notice was issued, and respondent indicates that he would have offered those

---

[19]Petitioners in their reply brief note that Rule 41(b) treats an issue that is not raised in the pleadings as being raised in the pleadings if the issue was tried by the express or implied consent of the parties. Petitioners suggest in their reply brief that Rule 41(b) applies here because the parties' stipulations establish the date that petitioners' 2003 return was filed and that the deficiency notice was issued more than three years later. As petitioners see it, the parties' stipulations put respondent on notice that the expiration of the three-year limitations period was in issue. We disagree. In addition to the fact that petitioners first raised this argument in their reply brief, which by itself makes this argument untimely, we read nothing in the stipulations that specifies either that petitioners were disputing that the deficiency notice was timely or that the parties were building an evidentiary record for the Court to decide such a dispute. Had petitioners properly raised the limitations period as an issue in their pleadings, respondent might have been able to present evidence that petitioners had in fact extended the limitations periods for both years by timely executing Form 872, Consent to Extend the Time to Assess Tax, as respondent claims in his reply brief. Respondent did not present any such evidence at trial, however, because he was not aware at that time that petitioners wanted to raise the limitations period as an issue.

**[*36]** extensions into evidence had petitioners timely raised the applicability of the limitations period as an issue.

Respondent essentially concludes that he would be unfairly prejudiced were we now to allow petitioners to raise the limitations issue and then decide that issue on the basis of the record at hand. Respondent notes that he helped build the record without any notification or hint that the consent forms would be relevant to combat petitioners' assertions with respect to this issue. We agree. Petitioners had ample opportunity to timely raise the applicability of the limitations period as an issue in this case, and their delay in attempting to raise the issue on brief unfairly prejudiced respondent.

Further, we do not agree with petitioners' argument that section 7491(a)(1) requires that we decide the issue even though it was not raised in the pleadings. The pleadings serve a vital role in litigation in this Court. While many issues could theoretically be in dispute in a given case, the pleadings specify the issues which are actually in dispute, as well as the parties' respective positions with respect thereto, and they allow the parties to efficiently and effectively litigate the case accordingly. See Rule 31(a).

In recognition and furtherance of this vital role, we have announced time and time again that we will generally consider only those issues which are properly

**[\*37]** raised in the pleadings.  See, e.g., Ill. Power Co. v. Commissioner, 87 T.C.

1417, 1449 (1986); Seligman v. Commissioner, 84 T.C. 191, 198-199 (1985),

aff'd, 796 F.2d 116 (5th Cir. 1986); Rollert Residuary Trust v. Commissioner, 80

T.C. 619, 636 (1983), aff'd, 752 F.2d 1128 (6th Cir. 1985).  We do not read section

7491(a)(1) to change or otherwise erode this firmly established rule.  The

applicability of the three-year limitations period is not properly before the Court,

and we decline petitioners' invitation in their opening brief to decide that issue.

III.  Capital Gains Income

Respondent determined that for Federal income tax purposes petitioners are

treated as selling the Marine stock to Mirror.  Respondent argues in support of this

determination that Sareb should not be treated as the seller because it was Mr.

Bruce's conduit or nominee.[20]  In this regard, respondent asserts, Mr. Bruce had

complete control over Sareb's finances as evidenced by the facts that he had

signatory authority over Sareb's bank accounts and appropriated all of the sale

proceeds to himself.  In addition, respondent asserts, petitioners effected the plan

primarily to avoid reporting gain on a sale of the Marine stock.  Petitioners argue

that the plan should be respected because the transactions underlying the plan had

real economic consequences and the plan meets the letter of the law.  In addition,

[20]Petitioners argue in their reply brief that respondent raised this issue too late.  We disagree.  The argument flows directly from the deficiency notice.

[*38] petitioners assert, Mr. Bruce consummated the plan purely for estate planning purposes as an integral aspect of an "estate-freeze" strategy.

We agree with respondent, as a secondary holding, that petitioners are treated as the seller of the Marine stock for Federal income tax purposes. We hold primarily that petitioners underreported their gain on Mr. Bruce's sale of his remainder interest to the Daughters' Trusts. We recognize that respondent neither determined nor argued that petitioners underreported their gain on the sale of the remainder interest. All the same, petitioners have invoked our jurisdiction to redetermine the deficiency that respondent determined, and the law is well settled that we may redetermine the deficiency on the basis of reasons other than those relied upon by the Commissioner or those argued by the parties. See Peoples Translation Serv. v. Commissioner, 72 T.C. 42, 51 (1979); Wilkes-Barre Carriage Co. v. Commissioner, 39 T.C. 839, 845 (1963), aff'd, 332 F.2d 421 (2d Cir. 1964); see also Helvering v. Gowran, 302 U.S. 238, 246 (1937); Cannon v. Commissioner, 949 F.2d 345, 347-348 (10th Cir. 1991), aff'g T.C. Memo. 1990-148.

While we generally will not decide a case on grounds other than those that the parties argued where to do so would surprise or prejudice a party, our decision that petitioners failed to correctly report the sale of the remainder interest does not

[*39] prejudice, and should not surprise, petitioners. Petitioners reported on their 2003 return that Mr. Bruce's sale of the remainder interest was a taxable event, and they reported that Mr. Bruce's basis in that interest was $5,419,549. Mr. Lukinovich also generally discussed in his opinion letters Mr. Bruce's sale of the remainder interest and concluded that the sale was a taxable event for which Mr. Bruce was required to recognize gain equal to the difference between his basis in that interest and its sale price. Furthermore, petitioners' reply brief essentially regurgitates Mr. Lukinovich's discussion on this matter. Neither petitioners nor Mr. Lukinovich explained in detail why they or he considered Mr. Bruce's basis in the Swap to be $5.5 million, a basis that each of them then apparently concluded entered into the calculation of Mr. Bruce's basis in the remainder interest. That omission of a critical step in their analysis does not necessarily mean that petitioners are prejudiced or should be surprised by our addressing and focusing on that crucial issue.

As to our primary holding, taxpayers may most definitely structure their business transactions in a way that minimizes their tax liability. See, e.g., Boulware v. United States, 552 U.S. 421, 430 n.7 (2008); Gregory v. Helvering, 293 U.S. 465, 469 (1935). The mere fact that the form of a transaction literally complies with the Code, however, does not necessarily mean that the form is

[*40] respected for Federal income tax purposes when in substance it is a different transaction. See, e.g., Knetsch v. United States, 364 U.S. 361, 365 (1960). Nor are we bound by a meaningless label (or a mislabel) that the parties to an agreement give to any or all parts of the agreement, but we decide the true nature of the agreement by looking to its substance and to the intention of the parties. See, e.g., Gregory v. Helvering, 293 U.S. at 469; Sandvall v. Commissioner, 898 F.2d 455, 458 (5th Cir. 1990), aff'g T.C. Memo. 1989-189, and aff'g T.C. Memo. 1989-56. Substance may therefore trump form, or as Shakespeare more eloquently explained: "That which we call a rose [b]y any other name would smell as sweet".[21]

With these thoughts in mind, we analyze the plan and its underlying transactions to the extent necessary. We need not decide whether the plan was legitimate, or whether the tax consequences which flow therefrom are as Mr. Lukinovich opined and as petitioners argue. This is because, even if we assume that the plan was legitimate, the use in the plan of the Swap is one example of a contrivance which we decline to recognize for purposes of deciding this case. Notwithstanding the labeling of the Swap as a "swap" in the relevant documents, the Swap was not a "swap" within the meaning of the financial market. In Bank

---

[21]William Shakespeare, Romeo and Juliet, act 2, sc.2, 43-44.

**[*41]** One Corp. v. Commissioner, 120 T.C. 174 (2003), aff'd in part, vacated in part and remanded as to an issue not relevant here sub nom. J.P. Morgan Chase & Co. v. Commissioner, 458 F.3d 564 (7th Cir. 2006), we dove deep into the world of financial derivatives and, aided in part by our Court-appointed experts, addressed matters specifically related to the swap industry.  We found that the swap industry defines a swap as "a bilateral agreement the value of which is derived * * * from the performance of an underlying asset, reference rate, or index."  Id. at 185; see also sec. 1.446-3(c)(1), Income Tax Regs. (stating that a "swap" is a form of a "notional principal contract" and that "[a] notional principal contract is a financial instrument that provides for the payment of amounts by one party to another at specified intervals calculated by reference to a specified index upon a notional principal amount in exchange for specified consideration or a promise to pay similar amounts").  We see no reason why our Bank One definition of a "swap" is not applicable here.  Because all of the amounts to be advanced and repaid under the Swap were fixed at the time of the underlying agreement, and the Swap in turn did not derive its value from the performance of an underlying asset, reference rate, or index, we decline to recognize the Swap as a "swap" for purposes of our analysis.

**[*42]** At best, the Swap here was a loan arrangement under which one party promises to advance cash to the other party, and the other party promises to repay that cash with stated interest on a certain date. The terms of the Swap stated that one party (Mr. Bruce) would pay to the other party (Gamma) $5.5 million on May 23, 2003, and that the other party (Gamma) would pay the first party (Mr. Bruce) $5,530,152 on July 31, 2003. These terms, on their face, resemble the basic terms of a loan arrangement. That said, however, the Swap, when viewed in tandem with the Gamma note, was not even a valid loan arrangement.

The parties to each of these instruments were the same, and the critical terms of the instruments were tailored to mirror each other and not to allow for the payment or receipt of any funds (other than the "fees" that Mr. Bruce had to pay Gamma under the Gamma note, most likely for its participation in the plan).[22] In addition, we do not find that any of the funds referenced in these instruments were actually lent or repaid, other than possibly through bookkeeping entries, and the terms of the Swap were not always followed, e.g., as noted supra p. 19, Gamma did not on July 31, 2003, pay as to the Swap the $5,530,152 that was then due.

---

[22]We do not consider material that the Swap stated that Gamma's payment was due on July 31, 2003, while the Gamma note stated that Mr. Bruce's payment was due on December 31, 2003.

- 43 -

[*43] The use of offsetting or circular cashflows strongly indicates that a transaction lacks economic substance. See Merryman v. Commissioner, 873 F.2d 879, 882 (5th Cir. 1989) (tax structuring disregarded where "money flowed back and forth but the economic positions of the parties were not altered"), aff'g T.C. Memo. 1988-72; Prof'l Servs. v. Commissioner, 79 T.C. 888, 928 (1982) (disregarding prearranged circular cashflows through a business trust); see also Knetsch, 364 U.S. at 366 (offsetting payments on annuity bond and notes resulted in sham). The use of meaningless labels and the disregard of key terms (or the failure to act as a reasonable person would as to a violation or enforcement of the terms) also point to that end.

Petitioners ask the Court to recognize the Swap and to find that Mr. Bruce's basis in the Swap was $5.5 million because, they assert, Mr. Bruce actually paid $5.5 million for the Swap. We decline to do so. We find no credible evidence in the record supporting a finding that Mr. Bruce actually paid $5.5 million for the Swap. Nor do petitioners attempt to rationalize why Mr. Bruce would have paid $5.5 million for his interest in the Swap, an interest that formally consisted of an obligation to pay $5.5 million and the right to a return of the $5.5 million shortly thereafter with interest.[23] In fact, it appears that Mr. Lukinovich may have had a

[23]Petitioners arguably derived their $5.5 million basis in the Swap from the
(continued...)

**[*44]** similar reservation in opining that Mr. Bruce had a $5.5 million basis in the Swap and therefore conveniently ignored this issue. This lapse is not further explained by the record in this case, but suffice it to say that the importance of this issue to the overall plan would be very hard to miss. Nevertheless, we find nothing in the opinion letters, nor have petitioners pointed to any place, where Mr. Lukinovich opines that Mr. Bruce's basis in the Swap was $5.5 million.

Petitioners assert that the plan should be respected in all regards because it was undertaken primarily for legitimate estate planning purposes. We disagree. We note the following facts which erode petitioners' assertion that the plan was undertaken primarily for legitimate estate planning purposes: (1) Messrs. Bruce and Rousse were the linchpin of Marine's business, and each of them was soon to be leaving the business which, in turn, meant an end to the business unless it was sold to someone who was willing to continue it; (2) Mr. Bruce desired to sell petitioners' Marine stock or its principal asset, the Sarah Jane, while Marine was

---

[23](...continued)
fact that the Swap provided that Mr. Bruce would "pay" Gamma $5.5 million on May 23, 2003. This "logic" is faulty. First, Mr. Bruce never actually paid the $5.5 million to Gamma before assigning his interest in the Swap to CTB. Second, even if he had made any such payment, the $5.5 million was formally stated to be repaid to him later that year, and petitioners did not realize any of the stated repayment as income. Petitioners cannot in this second instance reap an inappropriate double benefit by including the $5.5 million in basis while at the same time not realizing its repayment as income.

[*45] still in operation and to maximize the proceeds that petitioners retained upon any such sale; (3) Mr. Bruce participated in the offsetting loans, each with a short life, and the mislabeling by his advisers of one of the loans as a "swap"; (4) the Swap which Mr. Bruce reported had a value of $5.5 million was not in his estate before the plan began; (5) Mr. Bruce on advice of his professional advisers established CTB to terminate within two years of its making and to distribute its assets to him upon termination; (6) Mr. Bruce terminated CTB approximately three months after its making; (7) Mr. Bruce accepted the promissory notes from the Daughters' Trusts, which, at that time, were hardly creditworthy of issuing notes of that monetary amount (e.g., they lacked significant assets relative to the amount of the notes); (8) Mr. Bruce as an aspect of his advisers' scheme substituted the Marine stock, which had just been appraised at a fair market value of approximately $5.8 million, for the Swap, which had no value; and (9) Mr. Bruce replaced the value of the Marine stock with an equivalent amount of cash.

Mr. Lukinovich's tax opinion letters also speak loudly against finding petitioners' estate planning assertion as a fact. The letters state specifically that they were issued in response to a request as to the Federal income tax consequences flowing from the plan, and they make no mention that Mr. Bruce (or Mr. Rousse) was requesting the opinions for estate planning purposes.

[*46] We conclude that Mr. Bruce had no basis in the Swap. Furthermore, we assume, as petitioners ask us to find, that Mr. Bruce sold his remainder interest to the Daughters' Trusts for promissory notes totaling $5,419,549. Mr. Lukinovich opined that Mr. Bruce was required to recognize any gain that he realized on his sale of that remainder interest, and we understand petitioners to concede this point. Mr. Lukinovich also opined that Mr. Bruce's basis in his remainder interest equaled a portion of his basis in the Swap, and we understand petitioners to concede this point as well. Given our conclusion that Mr. Bruce did not have any basis in the Swap, it naturally follows that he also lacked any basis in his remainder interest. We accordingly conclude that petitioners' gross income for 2003 Federal income tax purposes includes the $5,419,549 notes in full.[24] We so hold.

Petitioners would still not prevail if we decided this case on the grounds that respondent argues. This is because the facts adequately support respondent's position that Mr. Bruce established and used Sareb as his conduit and nominee for the sale. An intermediary who is interposed between persons involved in a transaction may be disregarded under substance over form and related principles.

_____

[24]Petitioners vigorously assert that they elected out of the installment method as to the sale. See sec. 453. We therefore do not consider the applicability of the installment method to this sale. We also do not consider whether the fair market value of the notes was less than their face value. Petitioners have treated the values as the same, and we do likewise.

[*47] See Gregory v. Helvering, 293 U.S. at 469; Sandvall v. Commissioner, 898 F.2d at 458; Reef Corp. v. Commissioner, 368 F.2d 125, 129-130 (5th Cir. 1966), aff'g in part, rev'g and remanding in part T.C. Memo. 1965-72; Davant v. Commissioner, 366 F.2d 874, 880-883 (5th Cir. 1966), aff'g in part, rev'g in part and remanding S. Tex. Rice Warehouse Co. v. Commissioner, 43 T.C. 540 (1965); Blueberry Land Co. v. Commissioner, 361 F.2d 93 (5th Cir. 1966), aff'g 42 T.C. 1137 (1964); see also Superior Trading, LLC v. Commissioner, 137 T.C. 70, 88-90 (2011) (discussing the binding commitment test, the end result test, and the interdependence test, three alternative tests that courts employ to invoke the step transaction doctrine and disregard a transaction's intervening steps), aff'd, 728 F.3d 676 (7th Cir. 2013).  The record persuades us to (and we do) find that Sareb was Mr. Bruce's conduit and nominee for the sale.

Mr. Bruce aspired to sell petitioners' Marine stock or the Sarah Jane in connection with his retirement, and the Marine stock and the Sarah Jane each had a ready market in which the asset could be sold for approximately $5 million.  Mr. Bruce was mindful that the Marine stock and the Sarah Jane each had a built-in gain of approximately $5 million and that a significant amount of Federal income tax would be imposed on that gain when the property was sold.  Petitioners effected the plan to sell their Marine stock in the ready market aiming not to pay

[*48] any Federal tax on the built-in gain, and through the plan, petitioners parted with the stock, they received the proceeds of the sale, and apparently no one recognized any of the built-in gain. To be sure, however, Mr. Bruce continued to act throughout the plan as if petitioners owned the Marine stock up until the time that Mirror purchased the stock.

He consciously transferred the Marine stock to CTB in exchange for the Swap which was of no value, obviously knowing that this transfer was essential to the plan and that petitioners would eventually receive cash equal to their stock's full value. Two, he (through Mr. Rousse, his longtime friend and loyal employee), established Sareb with the Daughters' Trusts as its owners and with Mr. Rousse as its designated manager, and he received from the Daughters' Trusts promissory notes in the aggregate amount of the approximate value of the Marine stock. Three, he and his wife installed Mr. Rousse as the trustee of the Daughters' Trusts. Four, he maintained the ability, through Mr. Rousse, to draw from the Daughters' Trusts the funds which were received in connection with the sale of the stock. Five, at least during 2005 he maintained the ability to personally draw funds from one or more of the Daughters' Trusts' bank accounts to further receive the sales proceeds. Six, he allowed the Marine stock to be sold to Mirror. Seven, he received all of the proceeds of the stock sale. The fact that petitioners (rather than

[*49] Sareb) were the true owners of the Marine stock at the time of its sale is further seen from the fact that Mr. Bruce (and not Sareb or Mirror) later negotiated the terms of the sale of the Sarah Jane directly with Mr. Falgout and led Mr. Falgout to believe that Mr. Bruce (or a company that he controlled) owned the Sarah Jane at that time.

We conclude as a holding alternative to our primary holding that petitioners at all relevant times were the true owners of the Marine stock and that petitioners must recognize their gain on that sale.

## IV. Professional Fees

Respondent determined that section 162(a) does not let petitioners deduct $52,450 of the professional fees that Marine claimed for 2003. Petitioners argue that respondent's determination is wrong because, they assert, the disputed fees related to Marine's business.[25] We agree with respondent's determination.

Section 162(a) provides that "[t]here shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business". Marine's business in 2003 involved operating the Sarah Jane for profit. Thus, the requirements of section 162(a) must be met as

---

[25]Petitioners do not seek to deduct the fees under any other provision. We therefore do not consider whether the fees are deductible under any other provision including, for example, sec. 212.

[*50] to that business for Marine to deduct the disputed fees under section 162(a). See sec. 1.162-1(a), Income Tax Regs.

Deductions are a matter of legislative grace, and taxpayers bear the burden of proving their entitlement to any claimed deduction. See INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992). Professional fees may qualify under section 162(a) as an ordinary and necessary expense of a business. See Commissioner v. Tellier, 383 U.S. 687, 689-690 (1966); Bingham's Trust v. Commissioner, 325 U.S. 365, 374 (1945); Guill v. Commissioner, 112 T.C. 325, 328-329 (1999). Whether the disputed fees qualify as such is a question of fact, which hinges on the origin and the character of the fees. See United States v. Gilmore, 372 U.S. 39, 49 (1963); Commissioner v. Heininger, 320 U.S. 467, 475 (1943). In order to be "necessary", the fee must be "'appropriate and helpful'" to the development of Marine's business. Commissioner v. Tellier, 383 U.S. at 689 (quoting Welch v. Helvering, 290 U.S. at 113); see also Welch v. Helvering, 290 U.S. at 113-115. In order to be "ordinary", the fees must be "normal, usual, or customary" in Marine's type of business. See Deputy v. du Pont, 308 U.S. 488, 495-496 (1940); see also Welch v. Helvering, 290 U.S. at 113-115.

Petitioners assert that the disputed fees related to Marine's business, but they provide no citation of the record to support that assertion. Nor do we

[*51] independently find any credible evidence in the record to support that assertion. We find instead that the disputed fees originated from and pertained to Mr. Bruce's consummation of the plan and that he consummated the plan to benefit petitioners personally and without regard to Marine's business operation. In that regard, the record establishes that petitioners or Marine sought professional advice during the subject year primarily with respect to the plan and to its consummation. Accordingly, because the origin and character of the disputed fees were personal (and not business), the fees were not ordinary and necessary expenses of Marine's business nor directly connected with or proximately resulting from Marine's business. See Kornhauser v. United States, 276 U.S. 145 (1928). We sustain respondent's determination that the disputed $52,450 in professional fees is not deductible under section 162(a).[26] See also sec. 1.162-1(b) (7), Income Tax Regs.

V. Accuracy-Related Penalty

Section 6662(a) imposes a 20% accuracy-related penalty if any part of an underpayment of tax required to be shown on a return is due to, among other things, a substantial valuation misstatement. See also sec. 6662(b)(3). The accuracy-related penalty is increased to 40% in the case of a gross valuation

---

[26]We note that expenses associated with the planning or the execution of a sham transaction are not allowable as a deduction. See, e.g., Kirchman v. Commissioner, 862 F.2d 1486, 1490 (11th Cir. 1989), aff'g Glass v. Commissioner, 87 T.C. 1087 (1986).

[*52] misstatement.  See sec. 6662(h)(1).  A gross valuation misstatement exists if,

for the taxable year at issue, the value or adjusted basis of property reported on a

tax return is 400% or more of the amount determined to be the property's correct

value or adjusted basis.  See sec. 6662(e)(1)(A), (h)(1), (2)(A)(i).  The value or

adjusted basis claimed on a return for worthless property is considered to be 400%

or more of the correct value or adjusted basis.[27]  See sec. 1.6662-5(g), Income Tax

Regs.; see also Rovakat, LLC v. Commissioner, T.C. Memo. 2011-225, slip op. at

62, aff'd, 529 Fed. Appx. 124 (3d Cir. 2013).  The 40% penalty does not apply

unless the underpayment attributable to the valuation misstatement exceeds $5,000.

See sec. 6662(e)(2).

Respondent determined that petitioners are liable for the 40% accuracy-

related penalty under section 6662(h).[28]  Respondent bears the burden of

production on the applicability of the accuracy-related penalty in that he must

_____

[27]The statute was amended by the Pension Protection Act of 2006, Pub. L. No. 109-280, sec. 1219(a)(2)(A), 120 Stat. at 1083, effective for tax returns filed after August 17, 2006, to provide that there is a gross valuation misstatement if the reported value is 200% or more of the amount determined to be the property's correct value.

[28]Respondent determined that the accuracy-related penalty applied to the deficiency resulting from his adjustments for legal and professional fees, capital gains income, and itemized deductions.  We have discussed the first two adjustments and sustained them.  Respondent determined that the itemized deduction adjustment flowed computationally from the first two adjustments, and petitioners do not dispute that determination.  We agree with it as well.

[*53] come forward with sufficient evidence showing that it is proper to impose the penalty. See sec. 7491(c); see also Higbee v. Commissioner, 116 T.C. 438, 446 (2001). Petitioners claimed a $5,419,549 basis in Mr. Bruce's remainder interest which they reportedly sold on July 31, 2003, and we have concluded that Mr. Bruce's actual basis in that interest was zero. Petitioners therefore claimed a value that was 400% or more of the correct adjusted basis. We conclude that respondent has met his burden of production.[29]

Petitioners argue secondarily that they are not liable for the 40% accuracy-related penalty because, they assert, Mr. Bruce reasonably relied on the advice of Attorneys Lobrano and Lukinovich. Section 6664(c) excepts from the 40% accuracy-related penalty any portion of an underpayment for which the taxpayer establishes that the taxpayer had reasonable cause and acted in good faith. Whether this exception applies is a factual determination which turns on our

_____

[29]Petitioners assert that this case is appealable to the Court of Appeals for the Fifth Circuit and argue primarily that this Court should follow the precedent of that court, specifically Heasley v. Commissioner, 902 F.2d 380 (5th Cir. 1990), rev'g T.C. Memo. 1988-408, and Todd v. Commissioner, 862 F.2d 540 (5th Cir. 1988), aff'g 89 T.C. 912 (1987). Those cases hold that the 40% accuracy-related penalty does not apply where a transaction is disregarded for lack of economic substance. After the briefing was closed in this case, the U.S. Supreme Court rejected the holding of the referenced cases and concluded that the 40% accuracy-related penalty for gross valuation misstatement applies when a transaction lacking economic substance results in a valuation misstatement. See United States v. Woods, 571 U.S. __, 134 S. Ct. 557 (2013). We reject petitioners' primary argument without further discussion.

[*54] examination of all pertinent facts and circumstances, giving special attention to the extent of the taxpayer's effort to assess the taxpayer's proper tax liability. See sec. 1.6664-4(b)(1), Income Tax Regs.

An individual taxpayer's honest misunderstanding of fact or law that is reasonable in the light of, among other things, his or her experience, knowledge, and education may serve to meet the reasonable cause and good faith requirement. See id. Where, as here, an individual taxpayer claims reliance on the advice of professional tax advisers, we also require that the taxpayer establish that he or she meets "each requirement of the following three-prong test: (1) The adviser was a competent professional who had sufficient expertise to justify reliance, (2) the taxpayer provided necessary and accurate information to the adviser, and (3) the taxpayer actually relied in good faith on the adviser's judgment." Neonatology Assocs., P.A. v. Commissioner, 115 T.C. 43, 99 (2000), aff'd, 299 F.3d 221 (3d Cir. 2002); see Charlotte's Office Boutique, Inc. v. Commissioner, 425 F.3d 1203, 1212 n.8 (9th Cir. 2005) (quoting this three-prong test with approval), aff'g 121 T.C. 89 (2003); see also sec. 1.6664-4(c), Income Tax Regs.

We conclude that Mr. Bruce aspired to assess petitioners' proper tax liability but, through no fault of his own, made an "an honest misunderstanding of fact or law that is reasonable in light of all of the facts and circumstances". Sec. 1.6664-

**[*55]** 4(b)(1), Income Tax Regs. The fact that Mr. Bruce is an experienced and sophisticated seafarer, fisherman, and sea captain does not necessarily mean that he should have recognized that he had no basis in the Swap, that his relationship to Sareb would make petitioners (rather than Sareb) the seller of the stock for Federal tax purposes, or that the disputed fees were not deductible. Mr. Bruce has a high school education, and he routinely consults and relies upon professionals and other businessmen and employees such as Mr. Rousse in making his business decisions. We viewed and heard him testify credibly that he had a basic understanding as to tax matters, that he had no understanding of the complex transactions which made up the plan (including their purpose or significance, or the risks or benefits involved), that he accepted Mr. Lobrano's opinion that the plan was valid, and that he relied upon Mr. Lobrano's advice in consummating the plan and in reporting its consequences on petitioners' 2003 return.

We also are mindful that when the financial planners advised Mr. Bruce that the plan provided favorable tax benefits to him, Mr. Bruce did not simply rely upon that advice. He asked Mr. Lobrano to meet with the financial planners and then to advise Mr. Bruce whether the plan was valid. In other words, Mr. Bruce was not content to rely simply upon the promoters' advice as to the plan, but he sought independent advice from an experienced trusted tax attorney (Mr. Lobrano)

[*56] who Mr. Bruce retained to discuss with the promoters all relevant and necessary information as to the plan.

Mr. Lobrano, in turn, was Mr. Bruce's longtime tax adviser who regularly advised him on tax and on other legal matters; Mr. Lobrano had sufficient ostensible expertise to warrant reliance; Mr. Lobrano knew about the subject matter underlying the plan; and Mr. Lobrano took steps to make himself even more knowledgeable on that subject matter so as to assure himself that the plan was valid. We also add that we find nothing in the record to lead us to conclude that Mr. Lobrano had an inherent conflict of interest as to the plan. See generally Countryside Ltd. P'ship. v. Commissioner, 132 T.C. 347, 352-355 (2009) (distinguishing between a promoter and an independent professional tax adviser for attorney-client privilege purposes).

We conclude that it was objectively reasonable for Mr. Bruce to rely on Mr. Lobrano's advice, even though we conclude that the advice was wrong.[30] See

---

[30]The record does not establish that Mr. Bruce or Mr. Lobrano relied solely on the advice or opinion of Mr. Lukinovich, Mr. Doverspike, Mr. Ohle, and Mr. Deichmann as to any item. If they did, then that reliance may not have been reasonable given that Mr. Doverspike, Mr. Ohle, and Mr. Deichmann, and perhaps also Mr. Lukinovich, appear to have been "promoters" of the plan. See 106 Ltd. v. Commissioner, 136 T.C. 67, 79 (2011) (stating that a promoter is "'an adviser who participated in structuring the transaction or is otherwise related to, has an interest in, or profits from the transaction'" (quoting Tigers Eye Trading, LLC v. Commissioner, T.C. Memo. 2009-121)), aff'd, 684 F.3d 84 (D.C. Cir. 2012).

[*57] United States v. Boyle, 469 U.S. 241, 251 (1985) ("To require the taxpayer to challenge the * * * [expert], to seek a 'second opinion,' or to try to monitor * * * [the qualified adviser] on the provisions of the Code himself would nullify the very purpose of seeking the advice of a presumed expert in the first place."); see also Whitehouse Hotel Ltd. P'ship v. Commissioner, 755 F.3d 236, 247-250 (5th Cir. 2014), aff'g in part, vacating in part and remanding 139 T.C. 304 (2012); Stanford v. Commissioner, 152 F.3d 450, 461 (5th Cir. 1998), aff'g in part, vacating in part 108 T.C. 344 (1997); Chamberlain v. Commissioner, 66 F.3d 729, 732-733 (5th Cir. 1995), aff'g in part, rev'g in part T.C. Memo. 1994-228.  We hold that the 40% penalty does not apply and reject respondent's determination that it or a 20% penalty does.  Accord Streber v. Commissioner, 138 F.3d 216, 219-224 (5th Cir. 1998), rev'g T.C. Memo. 1995-601.

We have considered all arguments that the parties made and have rejected those arguments not discussed here as without merit.

[*58] To reflect the foregoing,

Decision will be entered for
respondent with respect to the
deficiency and for petitioners with
respect to the accuracy-related penalty
under section 6662(h).